# JOHN H. SHORT *vs.* STATE OF MARYLAND.

*Constitutional Law—Poll Taxes—Privileges and Immunities of Citizens of the U. S.—Compulsory Labor on Roads.*

A statute imposing compulsory labor upon persons residing in the several election districts of a county for the purpose of keeping the roads in repair, with the privilege of providing a substitute, or the payment of a stipulated sum in lieu of such personal service, is not a levying of taxes by the poll, within the meaning of the Constitution.

Such law is also not in conflict with the Fourteenth Amendment of the Federal Constitution, as abridging the privileges and immunities of citizens of the United State; that provision not being designed to control the power of the State over its own citizens.

The origin and character of the poll taxes prohibited by the Constitution, explained.

Appeal from the Circuit Court for Dorchester County. The appellant was indicted for a violation of the local road law of Dorchester County, in that, after having been duly summoned by the road supervisor, he refused to work on the roads of said county, or to provide a substitute, or to pay the sum of seventy-five cents in lieu thereof. A demurrer to the indictment alleged the invalidity of the said road law, being secs. 268-272 of Art. 10 of the Code of Public Local Laws, because in conflict with the 13th and 14th Amendments of the Constitution of the United States, with Art. 3, secs. 33 and 40 of the Constitution of Maryland, and Art. 15 of the Declaration of Rights. The demurrer being overruled, the case was tried before the Court and the appellant was found guilty and sentenced to pay a fine of seventy-five cents, and to stand committed until the fine and costs were paid. The appellant appealed from the order overruling his demurrer by a petition assigning errors.

The cause was argued before ROBINSON, C. J., McSHERRY, FOWLER, BRISCOE and ROBERTS, JJ.

*George M. Russum* and *Sewell T. Milbourne*, for the appellant.

1. Sections 268, 269 and 270 of Art. 10 of the Code of Public Local Laws, title, "Dorchester County," sub-title, "Roads," are null and void, because they violate (*a*) the 13th and 14th Amendments to the Constitution of the United States, and (*b*) the 40th section of Art. 3 of the Constitution of this State.

(*a.*) They are in violation of the 13th and 14th Amendments of the Constitution of the United States, because they impose involuntary servitude upon "all able-bodied male residents" of said county above the age of 20 and under 50, who have resided thirty days "within any road district" of said county, and abridge "the privileges and immunities of citizens of the United States," and deny to such persons "the equal protection of the laws." The work required is *compulsory* and is an infringement of the personal liberty—the liberty of contract—the liberty to dispose of his labor and property as he thinks best for the protection of his welfare and happiness—of every person who may be required to perform it. It is distinctly a personal servitude, to which there is no limit, except the judgment of the super visor as to what shall be "necessary." 1 *Code Pub. Local Laws, title "Dorchester County,"* secs. 268, 269, 270 ; *In re. Sah Qua,* 31 Fed. Rep. 330; *Slaughter House Cases,* 16 Wallace, 69 ; *In re. Ah Fong,* 3 Sawyer 157 ; *Ah Kow* v. *Nunan,* 5 Sawyer, 562; *Re. Ah Chong,* 6 Sawyer, 565 ; *In re. Jacobs,* 98 N. Y. 98 ; *Singer* v. *The State,* 72 Md. 465 ; *Tragesser* .v. *Gray,* 73 Md. 259; *Herelfich* v. *Catonsville Water Co.,* 74 Md. 296 ; *Henderson* v. *Mayor of New York,* 92 U. S. (2 Otto), 259 ; *Yick Wo* v. *Hopkins,* 118 U. S. 370 ; *Powell* v. *Pennsylvania,* 127 U. S. 684.; *Kuhn* v. *Detroit,* 70 Mich. 534.

(*b.*) They violate the 40th section of the 3d Article of the Constitution of this State, because they authorize "private property"—labor, proper implements, money—to be "taken" for public use without compensation. They authorize the confiscation of the property of the able-bodied

male residents described therein—that is, their labor, and the proper implements and their money for such time, not *less* than two days, as the supervisor may deem "necessary." The Legislature has no such power. If it can authorize the property of the citizen to be taken for public use for two days, without compensation, it can deprive him of it altogether. Art. 3, sec. 40, Constitution of Maryland (1867), *Wynehamer* v. *The People*, 13 N. Y. (3 Kernan) 384; *Bloodgood* v. *Ml. etc. Co.*, 18 Wend. 18; *Slaughter House eases*, 16 Wall. 69; *Waters* v. *Wolf*, 29 Atl. Rep. 651.

2. They violate sec. 15 of the Declaration of Rights, because (*a*) they impose a poll tax, and (*b*) establish an arbitrary rule of taxation, without regard to the "actual worth in real and personal property" of the person taxed. Besides, while describing the class of persons liable to be taxed, they delegate to the supervisor the authority to select the particular person who shall be compelled to pay it, which is beyond the power of the Legislature. *Daly* v. *Morgan*, 69 Md. 467; *Appeal Tax Court* v. *Patterson*, 50 Md. 367; *Tyson* v. *Balto. Co.*, 28 Md. 527; *Williams' case*, 3 Bland, 255; *Proffit* v. *Anderson*, Va. 1894.

The Bill of Rights is the essence, the substance, the very *ousia* of the common law, and the common law never ceases to operate through lapse of time or non-user. *Buchanan* v. *State*, 5 H. & J. 317.

The statute in question also violates sec. 33 of Art. 3 of the Constitution, in that it is special legislation in a case for which provision has already been made by existing general laws, since the County Commissioners have control of the county roads.

*John Prentiss Poe, Attorney-General* (with whom was *P. L. Goldsborough, State's Attorney of Dorchester County*, on the brief), for the appellee.

A road system, one hundred and ninety years old, is now, for the first time, sought to be set aside as unconstitutional, and for reasons, some of which, if applicable at

all, were applicable as well when it was established as they are now, and yet until now its validity has never been questioned.

The system is by no means peculiar to Maryland, but will be found to have prevailed in other States of the Union. Indeed, it seems to have been a familiar mode of providing for the repairing of public roads, and the right of the States to call upon their people, either to render service themselves for such purpose, or to furnish a substitute, or to pay in money an equivalent for such service, and the corresponding duty of the citizen to respond to such call, seem to have been universally treated as standing upon the same footing as compulsory militia service by persons between certain specified ages, and compulsory jury service, also by persons between specified ages. The system itself seems to be almost as old as the common law. It appears that in 1550 the care of the public roads in England was first left to parishes. In 1555 it was regulated by statute, and this statute has been amended by many subsequent Acts. Sir Wm. Blackstone's statement is that " Every parish is bound of common right to keep the highroads that go through it in good and sufficient repair, unless, by reason of the tenure of lands, or otherwise, this care is consigned to some particular private person. From this burthen no man was exempt by our ancient laws, whatever other immunities he might enjoy ; this being part of the *trinoda necessitas*, to which every man's estate was subject, viz., *expeditio contra hostem, arcium constructio, et pontium reparatio.* For, though the reparation of bridges only is expressed, yet that of roads also must be understood." 1 *Black Com.* 538.

"A levy is sometimes made payable in labor, but this has commonly been restricted to the labor needed to keep the highways in repair ; and while it is in its nature a tax, it partakes to some extent of a police regulation. Neither in common speech nor in the customary revenue legislation would a burden of this nature be understood as embraced in the term tax ; and statutory provisions for assessment

are not therefore applicable to it unless made so in express terms." *Cooley on Taxation,* page 14. Nor are the constitutional provisions, in regard to taxation, applicable to statutes requiring labor in public roads. See *Dillon on Municipal Corporations,* 676, and 760 to 762; *Elliott on Roads,* 7; *Burroughs on Taxation,* sections 5 and 9; *1st Minor's Inst.,* 2d ed. p. 115. The text of these authors is abundantly sustained by the decisions. *State* v. *The Commrs. of Halifax,* 4 Dev. 347; *Sawyer* v. *Alton,* 4 Ill. 130; *Town of Pleasant* v. *Kost,* 29 Ill. 494; *Cooper* v. *Ashe,* 76 Ill. 11; *Tipton* v. *Norman,* 72 Mo. 380; *Johnson* v. *Macon,* 62 Georgia, 645; *Miller* v. *Gorman,* 38 Penn. St. 311-12; *Starkesboro* v. *Town of Henesburg,* 13 Vt. 215; *The Overseers of the Poor of the Town of Amina* v. *The Overseers of Stanford,* 6 Johns. 92; *M. & C. C.* v. *Greenmount Cemetery Company,* 7 Md. 531.

*As to the 13th Amendment.* It is not necessary to say much upon this point, for, in view of the decision of the Supreme Court of the United States in the *Slaughter House cases,* 16 Wallace, 69, it would seem to be quite plain that the imposition in question can hardly be termed an "involuntary servitude," within the meaning of that amendment. Indeed, it requires some effort to suppose that the framers of that amendment, and the Legislatures of the several States which adopted it, prohibiting slavery and involuntary servitude, except for crime, designed thereby to wage relentless war upon and destroy the time-honored road system of Dorchester County, under which males between the years of twenty and fifty, in the several road districts of that county, might be called on for the local improvement of their respective districts, to work three days in the year themselves, or by acceptable substitutes, or to pay the oppressive amount of seventy-five cents per day.

*As to the 14th Amendment.* It is likewise difficult to perceive how this local road system is in conflict with the 14th Amendment. We do not know of any " privileges or immunities of citizens of the United States" which it

"abridges," nor are we aware of any laws, "the equal pro-
tection" of which it "denies" to the appellant. The de-
cision of the Supreme Court in the Slaughter House cases,
seems also effectually to dispose of this ground of objection.

The local road law of Dorchester County does not in any
sense contemplate or provide for "the taking of private
property for public use without just compensation." It has
nothing to do with the power of eminent domain, to which
alone this section of the Constitution is applicable. It is
merely an exercise for purpose of local improvement and
benefit of the taxing power or police power, either or both,
of the State. The distinction between these powers and
the power of eminent domain is very clearly stated in the
opinion of Judge Field, in *County of Mobile* v. *Kimball*, 102
U. S. 703. To the same effect precisely are the decisions
of this Court. *Moale* v. *Mayor, &c.*, 5 Md. 320; *Groff* v.
*Mayor, &c.*, 44 Md. 77.

Nor can the burden in question justly be treated as a poll
tax within the meaning of the Bill of Rights. *Williams'*
*case*, 3 Bland, 254; *Steele* v. *C. & P. R. R. Co.*, 40 Md.
51; *Wells* v. *Hyattsville*, 77 Md. 141; *McMahon's History*
*of Maryland*, 397-401.

ROBINSON, C. J., delivered the opinion of the Court.

By the Public Local Laws for Dorchester County all
able-bodied residents of the county above twenty and under
fifty years of age are compelled to labor two days at least
in every year in repairing the roads of said county, with
the privilege, however, of furnishing a substitute, or paying
to the road supervisors seventy-five cents for each day such
person may be summoned to labor, the money thus paid to
be expended in repairing the roads.

And it further provides that any one neglecting or refus-
ing to perform such labor, or to provide a substitute, or to
pay seventy-five cents per day for each and every day he
may be summoned to work, shall be guilty of a misde-
meanor, and upon trial and conviction before a Justice of the

Peace, shall be fined seventy-five cents for each day's delinquency and costs, and shall stand committed until the fine and costs are paid. Sections 268, 269 and 270, Local Laws Dorchester County. And the Act further provides, that any one aggrieved by the judgment of the Justice of the Peace may appeal to the Circuit Court.

The main question, and the only one, it seems to us, about which there can be any real contention, is whether this local law is in conflict with the Constitution, which declares, "that the levying of taxes by the poll is grievous and oppressive, and ought to be prohibited. Art. 15, Declaration of Rights, Constitution of 1867. And in construing the meaning of this Article, we must bear in mind that the same declaration is to be found in the Constitution of 1776, and in every Constitution adopted in this State down to the Constitution of 1867. So the question comes to this: Is compulsory labor imposed upon persons residing in the several election districts of a county for the purpose of keeping the roads in repair, with the privilege of providing a substitute, or the payment of a stipulated sum in lieu of such personal service, a *"levying of taxes by the poll,"* within the meaning of the Constitution?

Such compulsory labor is beyond question a burden on the persons upon whom it is imposed; and though it assumes the form of labor, it may be fairly considered, we agree, in the nature of a tax. At the same time, when this article in the Bill of Rights is construed in the light of the legislation in regard to levying taxes by the poll in force when the Constitution of 1776 was adopted; and in the light of the legislation in regard to compulsory labor on the public roads, also in force at that time, and which has continued in force down to the present, it is clear, we think, that compulsory labor for the purpose of keeping the roads in repair has never been considered as a poll tax, prohibited by the Constitution. A brief reference to the legislation in force when the Constitution of 1776 was adopted will clearly show, we think, the nature

and character of poll taxes, the levying of which was de-
clared to be grievous and oppressive, and ought to be *abol-
ished.*   If we turn to the Act of 1715, chapter 15, we find
that all persons, males and females, free and slave, above the
age of sixteen years, are declared to be "*taxables,*" and
upon each person thus declared to be a taxable, the com-
missioners of the several County Courts were· directed to
levy a specific sum, to be paid in money or tobacco, for the
support of the Government.   And this Act, providing for
the levying of taxes by the poll, continued in force down
to the Revolution.

And in addition to the poll taxes thus levied for public
purposes, the Act of 1702, chap. 1, declaring the Church
of England to be the established church of the colony, also
provided that a tax of forty pounds of tobacco *per poll* should
be levied each and every year, for the support of the clergy,
and this Act continued in force down to the Revolution.
And strange as it may seem nowadays, the poll taxes, to
which we have referred, were the only *direct taxes* levied for
public purposes during the colonial· period.   Such taxes
thus levied, without reference to the ability or the means of
the "taxable" to pay them, must necessarily have been, in
many cases, burdensome and oppressive, and it was such
levying of taxes by the poll that the Constitution of 1776
denounced as being "*grievous and oppressive,*" and which
ought to be "*abolished.*"

And whilst poll taxes were levied for public purposes,
the public roads were made and kept in repair by compul-
sory road labor, and with this article in the Constitution of
1776, prohibiting poll taxes, statutes compelling persons
to labor on the roads for the purpose of keeping them in
repair, have been in force down to the present time, and
this is the first time the constitutionality of such laws has
been questioned.

As early as the Act of 1704, chapter 21, all laborers and
servants were required to work on the public roads, and
upon the refusal of such laborers to perform the services

thus required, or the master to furnish his servants, the master and laborers were liable to indictment and punishment. This law was substantially in force when the Constitution of 1776 was adopted, and continued in force for years after its adoption. And instead of being repealed, or being considered as repugnant to the article in the Bill of Rights of 1776, the Act of 1795, chap. 37, recites " that whereas doubts have arisen what description of persons are intended to work on the public roads under the existing laws, to which this is a supplement; therefore, Be it enacted, that every able-bodied male person shall be and is hereby made subject to like personal service." And this Act further provided for the payment of money in commutation of such personal service. And though this Act has been amended from time to time, and most of the counties have been exempted from its operation, the main features of the Act, the compulsory service, with the privilege of furnishing a substitute or paying a stipulated sum in lieu thereof, have been part of the local law of Dorchester, Somerset and other counties, down to the present time. In construing this Article in the Bill of of Rights of the Constitution of 1867, being identical with the Article in the Constitution of 1776, it is but fair to presume that the framers of the Constitution of 1867, and the people who adopted it, understood this limitation on the power to levy taxes by the poll in the sense in which it had been construed and acquiesced in for nearly one hundred years.

Similar statutes in other States have been in operation for years, and their validity, when questioned, has been fully sustained. And referring to these statutes, Judge Cooley says : " Though the public burden assumes the form of labor, it is still taxation, and must therefore be levied on some principle of uniformity. But it is a peculiar species of taxation, and the general terms " tax " or " taxation," as employed in the State Constitutions, would not generally be understood to include it." *Cooley on Constitutional Limitations,* (6th ed.) 629; *Cooley on Taxation,* 14.

And then as to the objection that this local law is repugnant to that clause in the Fourteenth Amendment of the Federal Constitution, which declares that " No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States," it is sufficient to say that the interpretation of that clause by the Supreme Court in the *Slaughter House cases*, 16 Wallace, 36, is a complete answer to this objection.    There is a distinction, says Mr. Justice Miller, between citizenship of the United States and citizenship of a State.    To become a citizen of the United States it is only necessary that one should be born or naturalized in the United States ; but to be a citizen of a State he must reside within the State. Further, he says, " It is a little remarkable, if this clause was intended as a protection to the citizen of a State against the legislative power of his own State, that the word citizen of the State should be left out when it is so carefully used, and used in contradistinction to citizens of the United States in the very sentence which precedes it." And the Supreme Court held that this clause merely protected *"the privileges and immunities"* of citizens of the United States, and was not intended to control the power of the State governments over the rights of its own citizens.    And as to the privileges and immunities belonging to the citizens of a State, *"the latter must rest for their security and protection where they have heretofore rested,"* that is with the State in which the citizen resides.    And again, in *Bradwell* v. *The State*, 16 Wallace, 130, referring to the same clause in the Fourteenth Amendment, Mr. Justice Miller, speaking for the Court, says :  "The protection designed by that clause, as has been repeatedly held, has no application to a citizen of the State whose laws are complained of."

The appellant is a citizen of this State, and the law of which he complains as having abridged and interfered with his "privileges and immunities," is a law of his own State ; and this being so, the clause in the Fourteenth Amendment, on which he relies, has no application.    The law of which

he complains merely imposes on him the same duty and obligation which it requires of all other persons within the ages designated by the statute, without making any distinction whatever on account of color or race. And there is no ground on which it can be assailed as being repugnant to any of the provisions of the State or Federal Constitution. For a breach of the duty imposed on the appellant and all others, it provides for a fair and impartial trial, according to the law of the land, and upon conviction it provides that the offender shall be fined and stand committed until fine and costs are paid. No one can question the power of the State thus to provide for the enforcement of its law and the punishment of all who violate it. As to the policy and wisdom of the law in question, it is quite sufficient to say that is a matter resting with the Legislature and not with the Courts. *Cooley on Taxation*, 437; *Appleton* v. *Gray*, 5 Gray, 520.

*Rulings affirmed.*

(Decided February 27th, 1895.)