ALLIED AMERICAN MUTUAL FIRE INSURANCE COMPANY ET AL. *v.* COMMISSIONER OF MOTOR VEHICLES ET AL.

[No. 244, September Term, 1958.]

608

*Decided April 17, 1959.*

*Motion for rehearing filed May 15, 1959, denied June 4, 1959.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND and PRESCOTT, JJ.

*J. Cookman Boyd, Jr.,* and *Henry M. Decker, Jr.,* with whom was *Harris James George* on the brief, for the appellants.

*E. Clinton Bamberger, Jr.,* as *Special Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, Stedman Prescott, Jr., Deputy Attorney General,* and *James H. Norris, Jr., Special Assistant Attorney General,* on the brief, for the appellees.

Briefs of *amici curiae* were filed by *J. Kemp Bartlett, Jr., Joseph Sherbow* and *Edward F. Shea, Jr.,* on behalf of the Association of Casualty and Surety Companies and the National Association of Independent Insurers, and by *Richard W. Kiefer* and *Allan H. Fisher, Jr.,* on behalf of the Bar Association of Baltimore City.

HAMMOND, J., delivered the opinion of the Court.

The appellants, two mutual insurance companies that write automobile liability insurance, and an insured of each, brought a bill for a declaration that Ch. 836 of the Acts of 1957—the Unsatisfied Claim and Judgment Fund Law—was unconstitutional and void and for an injunction against the officials named in the Act to prevent its enforcement and administration. The chancellor found the law constitutional and denied the relief sought, and this appeal followed.

The Act was passed to meet what the Legislative Council's Committee on Motor Vehicle Insurance called the "growing and serious social problem stemming from the innocent victims of motor vehicle accidents who were unable to get redress from the other (and uninsured) parties to accidents." Although the Council's Committee recommended passage of a compulsory liability insurance law, it said: "In theory, the unsatisfied judgment fund would offer the greatest assur-

ance of such recovery." Report to the General Assembly of 1957, Special Committee Reports, pp. 391-392. The General Assembly did not follow the Committee's recommendation but passed the Unsatisfied Claim and Judgment Fund Law as a substitute.

The law provides for a fund to indemnify the innocent victims of financially irresponsible owners and operators of motor vehicles. The fund was to be accumulated from the fee of $1.00 required in 1958 from the registrant of each insured motor vehicle in Maryland. Thereafter, registrants of insured motor vehicles are not called upon for any contribution. In 1958 registrants of uninsured motor vehicles were required to pay a fee of $8.00 to the fund. In 1959 every insurer permitted to write automobile liability insurance in Maryland is required to contribute to the fund a sum equal to one-half of one per cent of its premiums on liability policies covering motor vehicles principally garaged in Maryland. On December 30th of each year, beginning with 1959, the Commissioner of Motor Vehicles is to determine whether there is a need for additional contribution to the fund in the ensuing year. If he finds such a need, he is to assess the estimated deficiency against the insurers and the registrants of uninsured motor vehicles. The insurers are required to pay annually one-half of one per cent of the total premiums of liability policies insuring motor vehicles in this State, or ten per cent of the estimated deficiency in the fund, whichever is less. The remaining ninety per cent of the estimated deficiency is to be assessed to and paid by registrants of uninsured motor vehicles, in equal shares.

The fund is administered by a board of six, the Commissioner of Motor Vehicles, the Insurance Commissioner, and representatives, appointed by the Insurance Commissioner, of each of four classes of insurers. Residents of Maryland or the owner of a motor vehicle registered in the state, or residents of any other state or a province of Canada which has a similar reciprocal law, may claim from the fund. When one entitled to make claim suffers damage to his property or injury to his person under circumstances which may entitle him to indemnification from the fund, he must give notice of the

intention to file a claim and supply information about the accident, injury and damage. The board that administers the fund is not authorized, or given a staff, to investigate claims to protect the fund from improper payments. The board is to assign claims for investigation and defense to insurers in proportion to their respective premium writings subject to assessment under the Act. If the claimant files suit against a financially irresponsible tortfeasor, the defendant is represented, and the fund defended, by counsel selected by the insurer to whom the claim has been assigned. The defendant must cooperate with such counsel, but he may have counsel of his own choosing because he is required to reimburse the fund for any payment it makes to satisfy the judgment against him. Until he does reimburse the fund, he may not register or operate a motor vehicle in this state. There are various provisions with respect to settlements, safeguarding payments from the fund, default actions, cases in which the identity of the tortfeasor is unknown, and criminal penalties for violations of the law.

The appellants' principal arguments are that the title of the Act violates Sec. 29, Art. 3 of the Constitution of Maryland, that the Act, in compelling insurers to contribute money and to render services at their own expense and without compensation, deprives them of their property without due process of law under the Fourteenth Amendment, Art. 23 of the Maryland Declaration of Rights, and Art. 3, Sec. 40 of the Constitution of Maryland, and that the Act is a denial of the equal protection of the laws contrary to the Fourteenth Amendment.

The title of the Act is in the form currently generally used. It recites that there are to be added thirty new sections to Art. 66½ of the Code, giving their numbers and their place of codification in the article, and that it is an act providing: "for the establishment, maintenance, and administration of an Unsatisfied Claim and Judgment Fund for the payment of damages for injury to or death of certain persons and for damages to property arising out of the ownership, maintenance and use of motor vehicles in this State in certain cases;

and relating generally to said Fund and to the financial responsibility laws of this State."

The appellants say that nowhere in the title do the words "insurance," or "insurer," or "insurance company" appear, although such companies are required to contribute monies and services to the fund; therefore, there is nothing to put such companies on notice as to the imposition of these burdens; and, in addition, the title is misleading in that it indicates a narrower scope than the body of the act is made to encompass. Chief reliance is put on *Culp v. Comrs. of Chestertown,* 154 Md. 620. We think the *Culp* case is clearly distinguishable. There the title of the act was misleading because it stated that the municipal improvements for which it provided were to be financed by a bond issue. The act levied an assessment on owners of adjoining property. The title stated one source of revenue; the body provided for an additional source. There is no such affirmative infirmity in the title of the act before us.

The commands of Sec. 29 of Art. 3 of the Maryland Constitution that every law shall embrace but one subject, which must be described in the title, have been said by this Court to be designed to prevent the combination in one act of several and distinct incongruous subjects and to require that the Legislature and the people of the state be fairly advised of the real nature of pending legislation. *State v. Norris,* 70 Md. 91, 95; *Neuenschwander v. Wash. San. Com.,* 187 Md. 67, 78-80. This Court has never leaned to a narrow interpretation of the constitutional requirements but has been of a disposition to uphold rather than defeat the enactment wherever possible. *Baltimore City v. Flack,* 104 Md. 107, 118; *Board of Education v. Wheat,* 174 Md. 314, 318. Numerous cases have said that while the title must indicate the subject, it need not give an abstract of the act nor mention the means by which the general purpose is to be accomplished, although it must not be misleading. *Painter v. Mattfeldt,* 119 Md. 466, 474; *Pressman v. State Tax Commission,* 204 Md. 78. It has been held that titles need do no more than indicate the precise article and section of the Code in which the new legislation appears. *Dean v. Slacum,* 149 Md. 578, 580. Since

the description in the title which follows the codification language fairly apprised the Legislature and the people of the purpose of the Act, and was not misleading, it is not fatal that the means and methods by which the legislation is to be carried into effect are not spelled out. *Baltimore City v. Flack, supra; Bond v. State,* 78 Md. 523, 525; *Oursler v. Tawes,* 178 Md. 471, 487; *Baltimore v. Reitz,* 50 Md. 574, 579; *Benesch v. State,* 129 Md. 505, 510.

The Supreme Court of New Jersey recently sustained the Unsatisfied Claim and Judgment Fund Law of that state against an attack on its title. The New Jersey Constitution has the same provision as Maryland that every law shall embrace but one object and that shall be expressed in the title. The title of the New Jersey Act is not distinguishable from the title of the Maryland Act, and the New Jersey Court held that the title complied with the constitutional requirements, and said: "A title to an act need not be an index to all that it contains and need not set forth all of its exclusions or conditions. It is a label and need only set forth its object, not its product." *Robson v. Rodriquez,* 141 A. 2d 1, 7. We find no constitutional infirmity in the title of the Maryland Act.

Appellants do not seriously argue that the purpose of the law, to mitigate hardships caused by highway accidents for which uninsured and impecunious motorists are liable, is not a proper public purpose. They do not as seriously challenge the imposition of the monetary payments required by the Act as they do the requirements for services to be performed. They say, assuming the proper public purpose of the law, the means invoked by the Legislature to accomplish the purpose, that is, the requirement that the insurers investigate and defend claims upon the fund, impose an unconstitutional burden upon them which amounts to the taking of property without just compensation, and that this cannot be done under the police power but only under the power of eminent domain. We consider the questions raised on this aspect of the case in the light of the fact that the Fourteenth Amendment, Art. 23 of the Maryland Declaration of Rights, and Art. 3, Sec. 40, of the Maryland Constitution, have been said to have the

same meaning and effect in reference to an exaction of property; *Leonard v. Earle,* 155 Md. 252, 260; and, therefore, the decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities. *Home Utilities Co. v. Revere,* 209 Md. 610.

We think insurers have no sound ground on which to challenge the right of the State to levy the small percentage of the Maryland premiums they are required to pay annually to the fund. It is clearly established that the State may raise funds by taxation to expend for general welfare, and it is for the Legislature and not the taxpayers or the courts to choose the methods and subjects of taxation. It is no proper objection to a scheme of taxation that the benefits paid and those to whom they are paid are unrelated to the persons taxed and the amount they pay, or that those who have to pay may not have contributed to the conditions requiring the tax and may not be benefited by the expenditure of the tax money. If the tax *qua* tax is good and the purposes for which it is laid would sustain a separate appropriation from the general funds, neither the tax nor the purpose is invalidated by being associated in the same legislation. *Carmichael v. Southern Coal Co.,* 301 U. S. 495, 81 L. Ed. 1245.

The right to impose the obligation the Act puts on insurers to supply the labor and skill to investigate and defend claims must rest on and be justified as an exercise of the police power, if it is to be valid. Essentially the police power of a state is no more than the power to govern. *Baltimore Gas Co. v. State Roads Comm.,* 214 Md. 266, 279; *Capital Transit Co. v. Bosley,* 191 Md. 502, 514. The power justifies regulations designed to promote the public convenience or the general prosperity, as well as those to promote public safety, health and morals, since it extends to the satisfying of great public needs and the promotion of the general welfare. *Maryland Coal and Realty Co. v. Bureau of Mines,* 193 Md. 627; *Bacon v. Walker,* 204 U. S. 311, 51 L. Ed. 499; *C. B. & Q. Railway v. Drainage Comm'rs,* 200 U. S. 561, 50 L. Ed. 596; *Nebbia v. New York,* 291 U. S. 502, 78 L. Ed. 940. The current thinking of the Supreme Court would seem to be illustrated by *Williamson v. Lee Optical Co.,* 348 U. S. 483,

99 L. Ed. 563, where the Court, in effect, held that state legislation, imposing regulations under the police power to correct an evil at hand, is valid if it might have been thought by the legislature that the particular measure was a rational way to correct it.

The due process clause does not, any more than the contract clause, inhibit a state from insisting that all contract and property rights are held subject to the fair exercise of the police power. *Atlantic Coast Line v. Goldsboro,* 232 U. S. 548, 558, 58 L. Ed. 721. The exercise of the power is fair when the purpose is a proper public one and the means employed bear a real and substantial relation to the end sought and are not arbitrary or oppressive. The Supreme Court said in *Erie R. R. Co. v. Williams,* 233 U. S. 685, 700, 58 L. Ed. 1155: "It is hardly necessary to say that cost and inconvenience (different words, probably, for the same thing) would have to be very great before they could become an element in the consideration of the right of a State to exert its reserved power or its police power." There are many holdings that enforcement of uncompensated obedience to a regulation passed in the legitimate exercise of the police power is not a taking without payment of just compensation. *N. O. Public Service v. New Orleans,* 281 U. S. 682, 687, 74 L. Ed. 1115; *Chicago, Burlington & Q. R. Co. v. Chicago,* 166 U. S. 226, 255, 41 L. Ed. 979; *Noble State Bank v. Haskell,* 219 U. S. 104, 110, 55 L. Ed. 112; *Capital Transit Co. v. Bosley, supra,* at page 514 of 191 Md.

Most governmental regulations of business necessarily cause inconvenience, effort and financial burdens for which no compensation is, or need be, paid. These uncompensated efforts are a part of the cost of participating in the complications of modern life and society. They may reduce the net return of the enterprise but, of itself, that brings about no constitutional weakness in the legislation that demands them. *Day-Brite Lighting, Inc. v. Missouri,* 342 U. S. 421, 96 L. Ed. 469.

The general principles have been applied concretely to facts and in areas analogous to those with which we are concerned. There can be no doubt that the providing of adequate roads and of measures for the safety and protection of

those who use the roads are primary functions of government. Similarly, the business of insurance, as one affected with a public interest, is subject to complete regulation by government. *Osborn v. Ozlin,* 310 U. S. 53, 66, 84 L. Ed. 1074. The state can use to the fullest its power to achieve desirable ends in both areas. The case of *California Automobile Assn. v. Maloney,* 341 U. S. 105, 109-110, 95 L. Ed. 788, both illustrates this proposition and substantially controls the case at bar, as we see it. There an automobile liability insurer refused to obey, as void under the due process clause, a California statute requiring insurers to write liability policies on uninsured motorists who had to have such policies in order to retain their drivers' licenses. It urged that the statute was invalid because it commanded insurers to enter into contracts against their will; it forced on insurers contracts with abnormal risks from which extraordinary financial loss might be expected; and it required the challenging insurer, which had selected only the best risks with the most favorable loss ratio and consequent low premiums, to alter its policy so as to insure more doubtful risks. The Supreme Court held that the insurer could be excluded from the state unless it obeyed the statute and accepted its proportionate share of undesirable risks. The Court said:

> "The case in its broadest reach is one in which the state requires in the public interest each member of a business to assume a *pro rata* share of a burden which modern conditions have made incident to the business. It is therefore not unlike *Noble State Bank v. Haskell,* 219 U. S. 104, which sustained a state law assessing each state bank for the creation of a depositors' guaranty fund. What was there said about the police power—that it 'extends to all the great public needs' and may be utilized in aid of what the legislative judgment deems necessary to the public welfare (p. 111)—is peculiarly apt when the business of insurance is involved—a business to which the government has long had a 'special relation.' * * * Here, as in the banking field, the power

of the state is broad enough to take over the whole business, leaving no part for private enterprise. * * * The state may therefore hold its hand on condition that local needs be serviced by the business. * * * Highway accidents with their train of property and personal injuries are notoriously important problems in every community. Clearing the highways of irresponsible drivers, devising ways and means for making sure that compensation is awarded the innocent victims, and yet managing a scheme which leaves the highways open for the livelihood of the deserving are problems that have taxed the ingenuity of law makers and administrators.

"Whether California's program is wise or unwise is not our concern. * * * Appellant's business may of course be less prosperous as a result of the regulation. That diminution in value, however, has never mounted to the dignity of a taking in the constitutional sense * * *."

*Noble State Bank v. Haskell, supra,* relied on in the *Maloney* case, rejected the argument of the state bank, which did not want to contribute a percentage of its deposits to a guaranty fund for weaker rival banks, that the assessment on it violated due process as taking its property without just compensation. The Court, speaking through Mr. Justice Holmes, said: "* * * there is no denying that by this law a portion of its property might be taken without return to pay debts of a failing rival in business. Nevertheless, notwithstanding the logical form of the objection, there are more powerful considerations on the other side. In the first place it is established by a series of cases that an ulterior public advantage may justify a comparatively insignificant taking of private property for what, in its immediate purpose, is a private use. * * * At least, if we have a case within the reasonable exercise of the police power as above explained, no more need be said."

This Court in *Maryland Coal and Realty Co. v. Bureau of Mines, supra,* held valid as a permissible exercise of the police

power a law that required strip mining operators to register, pay a filing fee of $100 and put up a bond to assure faithful compliance with the law, as well as compelled such operators to fill in the cuts and level them off so that trees, grasses and shrubs would grow. The Court said at page 638 of 193 Md.: "Nor are the requirements of the Act unduly oppressive upon those engaged in strip mining. * * * the leveling of the spoil banks could be done with the equipment they now use. The fact that the statute has the effect of increasing the cost of the strip mining does not make the statute unconstitutional. The exercise of the police power is for the promotion of the public good, and by virtue of it the State may lawfully impose upon the exercise of private rights such burdens and restraints as may be reasonably necessary and proper to secure the general health and safety."

That a state exercises the police power by exacting free services or the donation of tangible property, or its use, rather than money, does not change the tests of constitutional validity. A technique chosen by the legislature is not necessarily bad merely because it is relatively novel. Experimentation in the means of achieving proper governmental ends is permissible. Instances are not lacking in which the compulsory furnishing of services or property have been held not to affront due process as a taking without compensation. As a condition of the exercise of the franchise, public utilities have been compelled to reserve space in conduits for the free installation, use, and maintenance of municipal wires; to sprinkle the area between, and adjacent to their tracks; to grade and pave such areas; and to move, at their expense, facilities on or under state roads or land.[1] Railroads have been required to furnish, or pay the cost of, elimination of grade crossings, even though highway users, who make no

---

1. *Western Union Tel. Co. v. Richmond,* 224 U. S. 160, 56 L. Ed. 710; *Pacific Gas Co. v. Police Court,* 251 U. S. 22, 64 L. Ed. 112; *Atlantic Coast Line v. Goldsboro,* 232 U. S. 548, 58 L. Ed. 721; *N. O. Public Service v. New Orleans,* 281 U. S. 682, 74 L. Ed. 1115; *Baltimore Gas Co. v. State Roads Comm.,* 214 Md. 266, and cases cited therein.

contribution, will benefit.[2]   All able-bodied males in the state have been required to work free, six days a year, on the roads.[3]   Corporations may be forced to collect, keep records of, and pay over to the government the income, sales, or use taxes due by taxpayers.[4]   Lawyers have been compelled by the state to represent indigent defendants, without pay.[5] Oyster packers may be required to donate to the state up to twenty per cent of the shells they accumulate.[6]

The state could take over the business of automobile liability insurance completely and exclude private participation, or it could compel private insurers in that field to insure all motorists assigned to them, as the *Maloney* case makes plain on both points.   Since the State lawfully could impose those burdens or exactions on automobile liability insurers, it properly can make the lighter demands on them that the Act calls for, as a condition of doing in Maryland the business in which they are engaged for profit.   *Leonard v. Earle, supra,* 155 Md. 252; *Noble State Bank v. Haskell,* cited above.

The business from which the insurers make their profits protects not only their policyholders but also those who are injured or whose property is damaged by the negligence on the roads of their insureds.   The State decided against itself going into the business of insuring all motorists, against requiring compulsory insurance of all motorists, and determined that it would, in effect, go into the business of insuring

---

**2.** *Nashville, C. & St. L. Ry. v. Walters,* 294 U. S. 405, 79 L. Ed. 949, and cases cited therein.

**3.** *Butler v. Perry,* 240 U. S. 328, 60 L. Ed. 672, and Cf. *Short v. State,* 80 Md. 392.

**4.** *Brushaber v. Union Pac. R. R. Co.,* 240 U. S. 1, 60 L. Ed. 493; *General Trading Co. v. State Tax Commission,* 322 U. S. 335, 88 L. Ed. 1309, "To make the distributor the tax collector for the State is a familiar and sanctioned device."; *Topps Garment Corp. v. State,* 212 Md. 23, 27.

**5.** Although there is a conflict in the cases the majority rule is that lawyers may be so compelled. *Presby v. Klickitat County* (Wash.), 31 P. 876; *Ruckenbrod v. Mullins* (Utah), 133 P. 2d 325; Annotations, 130 A. L. R. 1439, and 144 A. L. R. 847.

**6.** *Leonard v. Earle,* 155 Md. 252, aff'd. 279 U. S. 392, 73 L. Ed. 754; *State v. Kennerly,* 204 Md. 412.

to a limited extent only impecunious motorists who were not insured. To accomplish this limited effort for the general public welfare, it called upon those in private business in the same field to pay in cash a comparatively insignificant proportion of Maryland premiums, which could not exceed ten per cent of the cost of the program, and to furnish, without direct recompense, the services and skill of their employees —the claims investigators—and of independent contractors customarily used by them in their own work—their lawyers. The claim of the insurers that these calls on their labor and skill are arbitrary and oppressive is in the abstract. No facts are shown or suggested as to how great or how heavy the burden will be in actual operation. It cannot now be said that what the insurers must do under the Act will bear upon them unduly. As was said in *Maryland Coal and Realty Co. v. Bureau of Mines, supra,* the work could be done "with the equipment they now use." In all probability the cost of the services performed will be recouped from added premiums charged policyholders. The policyholders are the ones who are most protected by the Act—a motorist who suffers a loss while operating his uninsured vehicle cannot claim against the fund—and, if the increased premiums the policyholders may pay hereafter are in part paid out by the insurers to investigate and defend claims against the fund, they, and not the insurers, will bear the ultimate burden now complained of by the insurers. If premium rate increases do not pay for the services, added business may. The disadvantages an uninsured motorist bears under the Act may drive many such to take out insurance. The uninsured motorist cannot recover from the fund for a loss suffered while operating his uninsured vehicle. He cannot register or drive a car while a judgment or claim the fund has paid has not been repaid by him to the fund. He will be called upon to pay his share annually to maintain the fund. The annual assessment may reach an amount that, added to the other disadvantages, would persuade many uninsureds to become insureds.

Because the Act cannot now be judicially envisioned as oppressive in the constitutional sense, the insurers are not precluded from showing later, if they can, that in actual prac-

tice it does bear upon them with unconstitutional hardship. *Abie State Bank v. Bryan,* 282 U. S. 765, 776, 75 L. Ed. 690.

We find no invalidity under the due process clause and pass to consideration of equal protection. Generally, one who attacks a regulation under the police power on the ground that it violates due process adds a claim that it is a denial of equal protection, and, although the scope of the two clauses is not coterminous, usually his case stands or falls on the strength or weakness of his due process argument. Except where discrimination on the basis of race or nationality is shown, few police power regulations have been found unconstitutional on the ground of denial of equal protection, which may be what prompted the Supreme Court to call the equal protection clause the "usual last resort of constitutional arguments." [7] The appellants can fare no better, we think, than do most on this point.

The constitutional need for equal protection does not shackle the legislature. It has the widest discretion in classifying those who are to be regulated and taxed. Only if the grouping is without any reasonable basis, and so entirely arbitrary, is it forbidden. Abstract symmetry or mathematical nicety are not requisites. The selection need not depend on scientific or marked differences in things or persons or their relations. If any state of facts reasonably can be conceived that would sustain a classification, the existence of that state of facts as a basis for the passage of the law must be assumed. The burden is on him who assails a classification to show that it does not rest on any reasonable basis. *Wampler v. LeCompte,* 159 Md. 222, 225; *Maryland Coal and Realty Co. v. Bureau of Mines, supra; Tatelbaum v. Pantex Mfg. Corp.,* 204 Md. 360, 370.

That the Legislature did not exceed the bounds has been shown, we feel, by the discussion as to due process. Automobile liability insurers make their profits because motorists use the roads and need protection both from paying claims and from not being able to collect if they are injured or damaged. It is reasonably conceivable, therefore, that insurers should be a group to pay taxes to be used to give protection

7. *Buck v. Bell,* 274 U. S. 200, 208, 71 L. Ed. 1000.

to those who use the roads—those who are their paying customers. The Legislature reasonably could have thought that the insurers, by reason of their experience and skill, could investigate and defend claims under the Act far better, and with less trouble and at less expense, than anyone else; and that they, more readily than others, could pass on any increased operating expenses to the insured motorists, who are the primary beneficiaries of the Act; or that they would receive added business from those now uninsured, which at the same time would cut down claims to be investigated and defended and add income to the treasury of the insurers. These readily conceivable states of fact show that the grouping of all automobile liability insurers in one classification rested on a reasonable basis and was neither the hostile discrimination nor the oppression of inequality at which the guaranty of equal protection was and is aimed.

The insurers say that they are discriminated against because, if the justification for their obligations under the Act be that they profit from traffic on the roads, others who profit for the same reason, such as truck and bus companies, service stations, oil companies and automobile and tire manufacturers, are not similarly called on; that discrimination exists because automobile liability insurers are selected to serve and not surety bonding companies; and finally, that the grouping of insurers and uninsureds puts incompatible classes together.

If the classification made by the Legislature is otherwise justified, there can be no sound complaint that the legislative purpose might be better or more fully achieved by other or more expansive and inclusive classification. *Chicago Dock & Canal Company v. Fraley,* 228 U. S. 680, 57 L. Ed. 1022; *Lincoln National Life v. Read,* 325 U. S. 673, 89 L. Ed. 1861; *Metropolitan Casualty Co. v. Brownell,* 294 U. S. 580, 79 L. Ed. 1070; *Daniel v. Family Ins. Co.,* 336 U. S. 220, 93 L. Ed. 632. The Legislature, with reason, could have decided that the nexus between the liability insurers and the problem under attack was closer and better defined than was true as to those not dealt with by the Act.

The answer to the argument of incompatibility seems obvious. Uninsureds were selected to bear almost ninety per

cent of the burden of the Act because they cause the trouble to be alleviated. Insurers were called on for the different reasons we have discussed. Two classes were chosen, not one.

The appellants seek to invalidate the Act by raising objections based on what could happen. They say the Act requires insurers to engage in the practice of the law, which is unlawful, requires lawyers to violate their code of ethics by being forced to represent conflicting interests and to serve clients without having direct and personal contact with them, and that the Treasurer of the State, in being called on by the Act to determine each year how much the fund should reimburse the State Treasury for administration expenses paid by the latter, is given improperly delegated power to expend unappropriated funds and no standards to guide the exercise of discretion in determining the amount of repayment.

It is apparent that no present justiciable issue is presented by these somewhat hypercritical objections to the Act. Investigation of claims is not practising law, and an insurer could arrange for the defense of suits in the same manner as insurers customarily now do. If an insurer attempted to defend by salaried lawyers in its regular employ, the question now sought to be raised could become a live issue.

The question of ethics is not raised by a lawyer—no lawyer is a party to this case—and we see no need to make present answer.

The argument as to the State Treasurer is fanciful. It is not alleged that the Treasurer intends, or has threatened, to violate his constitutional or statutory duties by seeking to pay out unappropriated monies. The determination of how much is to be repaid the State Treasury each year from the fund is ministerial.

None of the last three questions sought to be raised is now ripe for decision. *Hammond v. Lancaster,* 194 Md. 462, 472.

One further point remains. The appellants argue that since there were three effective dates mentioned in the Act, that is, June 1, 1957, April 1, 1958, and the provision that

it "shall become effective immediately so far as to permit the treasurer and commissioner to receive and collect the fees and assessments specified," that the whole Act has never become effective and is wholly meaningless. It is clear that under Sec. 2 of Art. 16 of the Constitution, the Act took effect June 1, 1957, since it was not passed as an emergency act. If the Legislature provides that an act, which under Art. 16 may not take effect until June 1, is to take effect sooner, the act stands but will not take effect until June 1. *Woelfel v. State,* 177 Md. 494, 504-505; 1 *Op. Att'y Gen.* 286, 288. The provision that the Act shall be fully effective on April 1, 1958, apparently was copied almost *verbatim* from the New Jersey Unsatisfied Claim and Judgment Fund Law. The admixture of dates was necessary in New Jersey because of the times on which motor vehicles are registered in that State. This provision, we think, may be treated as surplusage. *Pressman v. State Tax Comm., supra,* 204 Md. 78; *Thomas v. Police Commissioner,* 211 Md. 357, 361.

We find the Unsatisfied Claim and Judgment Fund Law in the posture in which it reached us to be constitutional and valid, and that it took effect on June 1, 1957.

*Decree affirmed, with costs.*