# BOARD OF SUPERVISORS OF ELECTIONS FOR ANNE ARUNDEL COUNTY, ET AL. *v.* ATTORNEY GENERAL OF MARYLAND, ET AL.

[No. 10, September Term, 1967, (Adv.).]

418

420

*Decided per curiam on March 7, 1967.*

*Opinion filed April 14, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, OPPENHEIMER, BARNES, McWILLIAMS and FINAN, JJ.

*David M. Blum, William W. Cahill, Jr.* and *Mark D. Coplin,* with whom were *Weinberg & Green* and *John A. Blondell* on the brief, for Board of Supervisors of Elections for Anne Arundel County, part of appellants, and *C. Maurice Weidemeyer* for Joshua F. Cockey of B., other appellant.

*Francis B. Burch, Attorney General, Alan M. Wilner, Assistant Attorney General,* and *Robert F. Sweeney, Deputy Attorney General,* for Attorney General of Maryland, et al., part of appellees, and *Joseph Sherbow,* for Maryland State Bar Association, other appellee.

HAMMOND, C. J., delivered the majority opinion of the Court. BARNES, J., dissents. Dissenting opinion at page 445, *infra.*

In June of 1965 Governor Tawes appointed a Commission to study the necessity for revision of the Constitution of Maryland,

to determine whether a convention should be held to prepare the revision and to suggest the procedures for the calling and holding of such a convention. The Commission concluded that a completely new constitution should be prepared by delegates to a convention and submitted to the voters of the State for adoption.

Pursuant to the recommendations of the Commission the Legislature by Ch. 501 of the Laws of 1966 provided for a special election to be held at the same time as the primary election of 1966 to take the sense of the voters on whether a convention should be convened, not earlier than September 1, 1967, and not later than September 1, 1968, to frame a new Constitution. By Ch. 500 of the Laws of 1966 it was provided that if a majority of those voting at the special election voted for a convention it should assemble on September 12, 1967, at such place and for such time as might thereafter be prescribed by law. Chapter 500 also provided that each County and each of the legislative districts of Baltimore City should have the same number of delegates in the convention as Ch. 2 of the Laws of the Special Session of October 11, 1965, prescribed for election to the House of Delegates at the General Election of 1966 from such county and legislative district.

The special election proposed by Ch. 501 was held on September 13, 1966, concurrently with the primary election. The vote was 160,280 for a constitutional convention and 31,680 against. Although the number of favorable votes was more than a majority of the total votes cast in the special election, that number was a minority of the total votes cast in the primary election.

When the General Assembly of 1967 began consideration of legislation to provide for the qualifications of delegates to the convention, the manner of their election, their compensation and the duration of and other matters relating to the convention, almost immediately it was confronted with problems, most of which stemmed from the prohibitions of the existing constitution against the holding of more than one office of profit or trust under the constitution or laws of the State. These legal questions, which included (1) the validity of Chs. 500 and 501 of the Laws of 1966, both of which were enacted as emergency

measures, even though § 2 of Art. XVI of the Constitution provides that no law creating an office shall be enacted as an emergency law, and (2) the eligibility of members of the Legislature and other public officers to serve as delegates to the convention, caused grave concern to the General Assembly and to the Secretary of State, in his case for their bearing on the performance of his functions in relation to the elective process.

To obtain a solution to the dilemma, the Legislature enacted Ch. 1 of the Laws of 1967 which authorized the Attorney General, on behalf of the General Assembly and the Secretary of State, to institute a declaratory judgment proceeding under Art. 31A of the Code in the Circuit Court for Anne Arundel County against the Board of Supervisors of Elections of Anne Arundel County and such other defendants as the Attorney General deemed appropriate to obtain a declaration of the correct answer to nine questions, lettered (a) to (i) (several of the questions having various subdivisions). Question (a) was: "Would a delegate to the constitutional convention be the holder of an office within the meaning of Articles 33 and 35 of the Declaration of Rights and Section 6 of Article I and Sections 11 and 17 of Article III of the Constitution of Maryland?" Questions (b) through (g) all were based on the premise that a delegate to the constitutional convention would be an officer and if it were held that he was not these questions, it was, and is, agreed, would not have to be answered. Question (h) was: "In light of the fact that those voting 'for' the calling of a convention did not constitute a majority of those voting in the election, is the calling of a convention at this time mandatory?" Question (i) was: "Can the calling of a convention be delayed by a period of two years?" [1]

1. The questions in full were:
    "(a) Would a delegate to the constitutional convention be the holder of an office within the meaning of Articles 33 and 35 of the Declaration of Rights and Section 6 of Article I and Sections 11 and 17 of Article III of the Constitution of Maryland?
    "(b) If a delegate to the constitutional convention would be the holder of such an office, was the office created by Chapter 500 of the Acts of the General Assembly of 1966?
    "(c) If a delegate to the constitutional convention would

On February 17, 1967, suit was filed by the Attorney General in the Circuit Court for Anne Arundel County on behalf

be the holder of such an office and the office was created by Chapter 500 of the Acts of the General Assembly of 1966, is that Act valid and effective notwithstanding the fact that it was passed as an emergency act?

"(d) If Chapter 500 of the Acts of the General Assembly of Maryland of 1966 is null and void as an entirety because passed as an emergency act, is Chapter 501 of the Acts of the General Assembly of 1966 thereby rendered invalid, null and void?

"(e) If Chapter 500 of the Acts of the General Assembly of 1966 is null and void in its entirety, can the General Assembly at its 1967 session call a constitutional convention without another referendum to take the sense of the people on the calling of such a convention?

(1) if Chapter 501 of the Acts of the General Assembly of 1966 was and is unconstitutional, null and void?

(2) if Chapter 501 of the Acts of the General Assembly of 1966 was and is valid and effective?

"(f) If a delegate to the constitutional convention would be the holder of such an office and the office was created by Chapter 500 of the Acts of the General Assembly of 1966, may a person holding another office within the meaning of the Declaration of Rights and Constitution of Maryland also hold the office of delegate to the constitutional convention?

(1) if such a person does not, in fact, receive compensation as a delegate to the convention whether or not compensation be paid or provided for as to some or all of the delegates to the convention;

(2) if such person does not receive compensation but receives reimbursement of actual expenses incurred in serving as a delegate to the constitutional convention;

(3) if such person does not receive compensation but receives a per diem expense allowance for his service as a delegate to the constitutional convention without being required to account for the amount of such expense allowance?

"(g) If a delegate to the constitutional convention would be the holder of such an office and the office was not created by Chapter 500 of the Acts of the General Assembly of 1966, but will be created by an act of the General Assembly of Maryland enacted at its 1967 session, may a person holding another office within the meaning of the Declaration of

of the Legislature and the Secretary of State against the individuals constituting the Supervisors of Elections of Anne Arundel County. On February 21, a petition to intervene as plaintiff was filed by the Maryland State Bar Association, Inc. (which had been designated in Ch. 1 as an interested entity) and granted, and on February 23 an individual taxpayer was allowed to intervene as a defendant.

The Attorney General and the Bar Association asked, inter alia, for a declaration that (1) a delegate is not the holder of an office, (2) a majority of persons voting at the election of September 13, 1966, voted in favor of calling a Constitutional Convention, and (3) the assembling of a convention may not be delayed. The Supervisors, on the contrary, answered and prayed the court to declare a delegate to be the holder of an office, that although a majority of those voting in the special election favored a convention, its calling either on September 12, 1967, or between September 1, 1967, and September 1, 1968, is not mandatory, and that the calling of a convention can be delayed for two years.

The intervening defendant urged that a delegate is the holder of an office, that the calling of a convention on September 12, 1967, is not mandatory, the matter being in the sole discretion

---

Rights and Constitution of Maryland also hold the office of delegate to the constitutional convention?

 (1) if such person does not, in fact, receive compensation as a delegate to the convention whether or not compensation be paid or provided for as to some or all of the delegates to the convention;

 (2) if such person does not receive compensation but receives reimbursement of actual expenses incurred in serving as a delegate to the constitutional convention;

 (3) if such person does not receive compensation but receives a per diem expense allowance for his service as a delegate to the constitutional convention without being required to account for the amount of such expense allowance?

"(h) In light of the fact that those voting 'for' the calling of a convention did not constitute a majority of those voting in the election, is the calling of a convention at this time mandatory?

"(i) Can the calling of the convention be delayed by a period of two years?"

of the General Assembly, that no special election was properly held for lack of adequate notice, particularly to independent voters and others not interested in the primary election, and since the General Assembly alone has the responsibility of determining whether to call a convention in 1967, the calling of such a convention may be delayed for two years.[2]

The court (Evans, J.) declared on February 28 that (1) a delegate to the convention is not the holder of an office within the meaning of Articles 33 and 35 of the Declaration of Rights or the meaning of § 6 of Article I or §§ 11 and 17 of Article III of the Constitution of Maryland; (2) adequate notice of the special election was given; (3) a majority of the persons voting at the special election of September 13, 1966, voted in favor of a constitutional convention; (4) the assembling of a constitutional convention may not be delayed; and (5) by reason of the adjudication and declaration that a delegate would not be an officer, the remaining issues became moot.

Chapter 1 of the Laws of 1967 conferred jurisdiction on the Court of Appeals to review the judgment and determination of the Circuit Court for Anne Arundel County and provided that "the decision of the Court of Appeals of Maryland upon such review shall have the same force and effect as any other final decision of the Court * * *." An appeal was taken from Judge Evans' order and we advanced the case, hearing argument on March 6. On March 7 we affirmed the adjudications and declarations below by per curiam order, all the judges but Judge Barnes concurring. We now set out the reasons for our affirmance.

No question was raised below or on appeal as to the jurisdiction of the Circuit Court and the Court of Appeals to hear and decide the matter. We think it appropriate to say that in our opinion the Circuit Court had jurisdiction under §§ 1, 2, 5 and 6 of Art. 31A of the Code, the Uniform Declaratory Judgments Act. Under § 1 courts have power "to declare rights, status and other legal relations" whether or not further relief

2. The plaintiffs and the defendants further disagreed as to the correct answers to questions (b) through (g) if it be declared that a delegate is the holder of an office under the Constitution or laws of Maryland.

is or could be claimed. In the case filed in the Circuit Court there were conflicting claims and the parties were legally, although not personally, hostile. Section 6 of Art. 31A authorizes granting of relief in all cases in which there is an actual controversy between contending parties or in which the court is satisfied "that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or * * * that a party asserts a legal relation, status, right, or privilege in which he has a concrete interest and that there is a challenge or denial of such asserted relation, status, right, or privilege by an adverse party who also has or asserts a concrete interest therein, and the court is satisfied also that a declaratory judgment or decree shall serve to terminate the uncertainty or controversy giving rise to the proceedings." The proceeding in which the Circuit Court granted declaratory relief met the tests of Art. 31A. *Md. Committee v. Tawes,* 228 Md. 412.

Chapter 1 of the Laws of 1967 gave the Court of Appeals its ordinary jurisdiction upon appeal to review the judgment and determination of the Circuit Court for Anne Arundel County. The Court of Appeals exercises appellate jurisdiction only and the Legislature cannot confer original jurisdiction on the Court, *Sevinskey v. Wagus,* 76 Md. 335, 336, nor require it to decide a moot question or an abstract proposition, *State v. Shields,* 49 Md. 301, 305, but the Legislature may confer the right on this Court to hear appeals in special cases provided appellate judicial functions and powers are left untrammeled. *State v. Northern Central Railway Co.,* 18 Md. 193, 210; *Prout v. Berry,* 2 Gill 147, 150. In the present case, as in *Northern Central,* the appellate review authorized by Ch. 1 was the customary review of live, concrete questions fairly presented by the transcript, all of which necessarily were involved in the decision of the trial court, and therefore was permissible.

We pass to the merits. Article 33 of the Declaration of Rights states that no judge shall hold any other office, "civil or military, or political trust, or employment of any kind, whatsoever, *under the Constitution or Laws of this State * * *.*" Article 35 follows to provide that "no person shall hold, at the same time, more than one office of profit, *created by the Constitution*

*or Laws of this State* * * *." Section 6 of Art. I of the Constitution recites that "every person elected, or appointed, to any office of profit or trust, *under this Constitution, or under the Laws, made pursuant thereto,*" shall take a prescribed oath of office under which he swears that he will not receive the profits "of any other office" during the term of his acting in the office for which he is qualifying. Section 11 of Art. III declares ineligible as a senator or a delegate all ministers and all other persons holding "any civil office of profit, or trust, *under this State*" (except justices of the peace). Section 17 of Art. III prohibits a member of the General Assembly during the term for which he was elected, from serving in "any office, which shall have been created, or the salary, or profits of which shall have been increased, during such term." (All emphasis has been supplied.)

The need for and purpose of these provisions manifestly was to protect against conflicts of interest, self aggrandizement, concentration of power, and the blurring or obliteration of the doctrine of separation of powers, in the performance by the agents of the people of their delegated authorities to exercise the executive, legislative and judicial functions of the organized government. We think the incompatible and barred offices were intended to be only those created by the Constitution or by the laws enacted pursuant to the Constitution in the exercise of some part of so much of the sovereignty of the people as was delegated to the formal organization which the people of Maryland constituted the current government of the State by the adoption of the Constitution. Section 56 of Art. III of the Constitution of Maryland confers upon the General Assembly "power to pass all such Laws as may be necessary and proper for carrying into execution the powers vested, by this Constitution, in any Department, or office of the Government, and the duties imposed upon them thereby." The delegated legislative powers of the General Assembly are plenary, except as limited by the Federal and State Constitutions. *Md. Committee v. Tawes,* 228 Md. 412, 439.

Commentators, lay and judicial, concur almost unanimously in the view that the general power of a state legislature to make, alter and repeal laws, pursuant to the constitution by which

the people created the legislature, does not include the power or the right to make or remake the fundamental law, the constitution. A state constitution may aptly be likened to a legislative act enacted directly by the people themselves in their sovereign capacity as a political entity (that is, by the voters, for "the original power of the people, in their aggregate political capacity, is delegated in the form of suffrage to such persons as they deem proper," *Anderson v. Baker,* 23 Md. 531, 619), and therefore is the fundamental, extraordinary act by which the pepole establish the structure and mechanism of their government. Cooley, *Constitutional Limitations* (8th Ed.), p. 355; Jameson, *Constitutional Conventions,* pp. 84-86, 422 and 586; Hoar, *Constitutional Conventions,* pp. 80-82; 16 Am. Jur. 2d, *Constitutional Law* § 26; *Staples v. Gilmer* (Va.), 33 S. E. 2d 49, 53; *Ellingham v. Dye* (Ind.), 99 N. E. 1; *State v. Cox,* 8 Ark. 436, 444. Essentially, a constitution is fundamental legislation directly by the people acting politically in their sovereign capacity, while a law is a rule of conduct prescribed by the legislative agents of the people under and subject to the delegated limitations of the previously ordained superior legislation, the Constitution.

This Court has recognized that laws and legislative actions relating to amendment or revision of the constitution differ greatly and significantly from one another.

In *Warfield v. Vandiver,* 101 Md. 78, 113-116, the Legislature, acting under Art. XIV of the Constitution, proposed an amendment to Art. I of the Constitution relating to the elective franchise and directed that the proposed amendment be submitted to the voters of the State in a prescribed manner at the next general election. The governor refused to submit the amendment because the legislative proposal had not been submitted to him for signature or rejection as an ordinary bill would have had to be. The case was argued well and fully by leading lawyers of the time. Chief Judge McSherry, for the unanimous Court on this point, in holding that submission to the governor was not required of a proposed constitutional amendment because it was not a potential law enacted under the Constitution but a potential part of the Constitution, said (pp. 114-116 of 101 Md.) :

"The distinction between a *bill* and a *law* is carefully maintained throughout the aforegoing section [§ 17 of Art. II providing for the executive veto] ; and the plain and clear provisions of the section make it morally certain that it has no application to a proposed Constitutional Amendment. This is the only provision in the organic law except section thirty of Article three, which confers upon the Governor authority to sign or veto a bill. If a proposal to amend the Constitution is not embraced by either of those sections, then Article 14 is unaffected by them; and as its terms do not include the Governor he has no power to approve or veto a measure propounded under it. * * * A bill proposing an amendment to the Constitution and nothing more, would *not* become a *law* if signed by the Governor nor would it become a *law* if passed by three-fifths vote over his veto; because it is required to be submitted to the people for *their* adoption or rejection; and not until it shall appear that a majority of the votes cast at the polls on such proposed amendment are in favor thereof can the Governor proclaim that it has been 'adopted by the *people* of Maryland as *part of the Constitution.*' It is not operative unless adopted by the *people*—it is a mere proposal to amend until sanctioned by them; and when adopted by *their* votes it becomes, not a *law* in the sense in which that word is used in the Constitution, but a *'part of the Constitution.'* * * *

"The people are the source of power. It is *they* who make and abrogate written constitutions, and when in the organic law which they have chosen for themselves they have designated the General Assembly, consisting of a Senate and a House of Delegates and nothing more, to be the agency for propounding amendments to the Constitution; no Executive has the right to step in between that agency and the people themselves and to say that without *his* approval *they* shall not be permitted to express *their* views on measures amendatory of the organic law. * * * Whilst

the Governor is entrusted with power to protect the people against hasty *legislation,* he is not given a prerogative to guard them against *themselves* in the matter of amending the organic law. He is not superior to them. It is *their* will which *he* must obey—it is not *his* will which *they* must subserve.

"Article 14 is a separate and distinct sub-division of the Constitution. It deals, in its first section, exclusively with the process of amending the Constitution and has no relation whatever to legislation. [It deals in its second section with taking the sense of the people every twenty years on calling a constitutional convention to undertake a general revision of the Constitution.] The other provisions in other articles to which allusion has been made are confined to *law* making— *this article* (emphasis supplied) is restricted to *Constitution* making; and the two subjects are widely disconnected in location and in substance."

The interpretation Dodd in his book *The Revision and Amendment of State Constitutions,* p. 150, gives the *Vandiver* decision is that "The Maryland Court said that the word 'bill' was used in the amending clause simply to express a proposal or project, and not in the same manner as the word was used elsewhere in the constitution to refer to bills which should become law by legislative enactment and executive approval."

The Legislature may not make the effectiveness or validity of a general law depend on its approval by the voters of the State, *Brawner v. Supervisors,* 141 Md. 586, because the people bindingly delegated to the Legislature the power to make laws, reserving no part of such power to themselves (except by way of referendum), and the delegated power may not be redelegated. In contrast, neither piecemeal amendments of the Constitution nor total amendment by way of adoption of the recommendations of the constitutional convention can take effect until the voters have given their approval—to piecemeal revision in the manner provided in § 1 of Art. XIV, and for total revision as provided in § 2 of Art. XIV, and as the Legislature provided in Ch. 4 of the Laws of 1967, passed since the decision below and the affirmance by this Court, or, mayhap, as

*Anderson v. Baker, supra,* at p. 616 of 23 Md. suggests, by acquiescence of the people, as happened in the case of the Constitution of 1776.

While the power of remaking the constitution is not in the Legislature, nevertheless, the Legislature may act to provide the mechanics for changes of the constitution by the people. To use the Legislature, a body created by the constitution, to provide the mechanics and sinews for changing that constitution by ascertaining the will of the people, for the election of delegates and the submission of their work to the people and at the same time to class their legislative actions as not encompassed by the provisions of the constitution as to laws may at first thought seem so illogical as to be unsound. Yet it has been accepted generally as sound and proper. "A supraconstitutional right requiring the assistance of constitutional authority is certainly an anomaly, and yet that is what exists in the case of conventions." Hoar, *op. cit.* p. 76. This technique is but part of the exercise of the fundamental right of the people to change their constitution whenever and however they deem fit; this right derives not from constitutions, but is a retained inherent right above and beyond the constitution, and therefore actions of the Legislature making available and supporting the exercise of that right—which with considerable perception and accuracy has been termed peaceful revolution [3]—are actions in ex-

---

**3.** Jameson, *Constitutional Conventions* at p. 303 quotes George M. Dallas as saying in 1836 of the forthcoming convention in Pennsylvania: "A Convention is the provided machinery of peaceful revolution. It is the civilized substitute for intestine war. * * * When ours shall assemble, it will possess, within the territory of Pennsylvania, every attribute of absolute sovereignty, except such as may have been yielded and are embodied in the Constitution of the United States."

Philip B. Perlman, an outstanding Maryland lawyer who was later Solicitor General of the United States, in addressing the Maryland Senate Committee on Amendments to the Constitution and the House Ways and Means Committee on March 19, 1931, *Journal of Proceedings of the Senate of Maryand* (1931) 517, 533, quoted another great Maryland lawyer Reverdy Johnson to the same effect. Mr. Perlman said:

"The Constitution of 1867 dropped the method of amending contained in Section 2 of Article XI of 1864, and so, at

ercise of the people's reserved powers of sovereignty and not actions in exercise of powers delegated by the Constitution. The Court, in *Anderson v. Baker, supra,* suggested, if it did not hold, this when Judge Bowie said (p. 616 of 23 Md.) :

"The powers of a Convention of the people of a State assembled to frame a form of Government, are no where defined. It is the right of the people to alter or abolish, or institute a new Government, 'laying its foundations on such principles, and organizing its powers in such form, as to them shall seem most likely to effect their safety and happiness.' The Convention is the depository of the residuary or reserved sover-

---

present we may amend the Constitution by Acts of the General Assembly submitting amendments to the people, or we may call a convention by the vote directed to be held every twenty years. These methods are set forth in the Constitution. But there is still another way to constitutional revision sanctioned by precedent in this State, because in Maryland the provisions in the Constitution limiting the methods of calling Constitutional Conventions have never been considered binding.

"Down through the years comes to us the voice of that great Maryland lawyer, Reverdy Johnson, who defended the legality of the Convention of 1851, called when the Constitution contained no authority for such a convention. And these are his views:

'No man denies that the American principle is well settled, that all governments originate with the people, and may by like authority be abolished or modified; and it is not within the power of the people, even for themselves, to surrender this right, much less to surrender it for those who are to succeed them. A provision, therefore, in the Constitution of any one of the United States, limiting the right of the people to abolish or modify it, would be simply void. And it was upon this ground alone that our Constitution of '76 was superseded by that of '51.'

"Referring again to the American principle that the people have a right to change their government, he said:

'In its nature it is revolutionary, but, notwithstanding that, it is a legal principle.'

Letter to Wm. D. Bowie and others, dated October 7, 1864."

eignty of the people, unlimited, except so far as restrained by the Constitution of the United States, and the moral law. Whether this action is dependent upon the subsequent ratification of the people or not, is not clearly established; but when ratified and adopted, or acquiesced in, their acts are unquestionably within the limits prescribed. The wisdom or wantonness of the act, its effect upon majorities or minorities, are not subjects of judicial cognizance. These are determined by their adoption."

Maryland consistently has recognized and acted upon the principle enunciated in *Anderson v. Baker* that the people of the State have the fundamental right to alter, modify or abolish and replace their form of government according to their sovereign pleasure.

*Maryland Constitution Conventional Proceedings of 1774, 1775 & 1776* (1836), pp. 184-89, reveals that on July 3, 1776, the Congress or Convention of Maryland, which had been the acting government for some two years, resolved "That a new convention be elected for the express purpose of forming a new government, by the authority of the people only, and enacting and ordering all things for the preservation, safety and general weal of this colony" and that all freemen above twenty-one, owning fifty acres of land or property "in this colony" of forty pounds sterling "be admitted to vote for representatives to serve in the said convention" and that "any person qualified as aforesaid to vote, may be elected a member of the intended convention" if he had resided in the colony for a year preceding the election. Members of the armed forces "of this province" were expressly disqualified.

The election was set for August 1, 1776, and the resolving Congress or convention dissolved itself and abrogated its powers and authority as of that date. The voters duly elected the delegates to the new convention, including a number who had been members of the previous convention.[4] The constitution

4. Including, it would appear from the *Maryland Constitutional Convention Proceedings of 1774, 1775 & 1776* (1836), Richard Barnes, Charles Carroll, barrister, Samuel Chase, Jeremiah T. Chase and

they produced, under which the State was governed until 1851, was not formally ratified by the people, but its making had been authorized by them and it was not finally adopted until their views were known and respected. Dodd, *The Revision and Amendment of State Constitutions,* pp. 12-13, indicates that there was direct popular influence on the forming and final adoption of the Constitution, saying:

"That some of the people of this state took a lively interest in the organization of government is shown by the fact that B. T. B. Worthington, Charles Carroll, barrister, and Samuel Chase, the two latter undoubted leaders and members of the committee to prepare a form of government, resigned from the convention because they had received 'instructions from their constituents, enjoining them, in framing a government for this state, implicitly to adhere to points in their opinion incompatible with good government and the public peace and happiness [*Maryland Constitutional Convention Proceedings of 1774, 1775 & 1776,* pp. 222 and 228 [5]]. Although there was no formal reference of the first constitution of Maryland to the people, the action taken by the convention on September 17, 1776, probably served a similar purpose. The committee had reported to the convention a proposed bill of rights and constitution; action upon this report was postponed until September 30th, and it was resolved 'that the said bill of rights and form of government be immediately printed for the consideration of the people at large, and that twelve copies thereof be sent without delay to each county in the state.' [*Id.* at 258]"

The Constitution of 1776 provided in § 39 that members of

---

Matthew Tilghman who presided over both the resolving Congress and the convention it called.

5. It would appear that, although a special election was suggested to replace them, Worthington, Carroll and Chase reconsidered their resignations and either returned to or remained in the convention. *Maryland Constitutional Convention Proceedings of 1774, 1775 & 1776* (1836), pp. 237, 241, 248.

the General Assembly could not hold any other office of profit, a provision proposed and adopted by a convention in which sat members of the prior legislative body. It also provided in Art. 59 that it could not be altered except by Act of two successive legislatures, the second of which had to be after a new election. Yet the Legislature in 1850 passed an act (Laws of 1849, Ch. 346) calling for an election to determine whether the people wanted a constitutional convention called and providing, if they did, for the election of delegates and a subsequent election at which the new constitution would be passed on by the people. Chapter 346 itself provided that members of the General Assembly "shall be eligible to a seat in the convention to assemble as hereinbefore prescribed, without affecting the tenure of their respective offices." Some—certainly nine, perhaps eleven, members of the General Assembly served in the convention notwithstanding the provision of § 39 of the Constitution of 1776.[6] The 1851 Constitution came into lawful and effective being by the action of the people, although not in the way prescribed in the then existing constitution. There seems to have been no challenge to the act calling the convention or the fact that members of the General Assembly sat as delegates.

The Constitution of 1851 provided in Art. 32 of the Declaration of Rights that "no person ought to hold at the same time more than one office of profit, created by the Constitution or laws of this State * * *." In the midst of the dissension created on the one hand by Maryland's allegiance to the Union and on the other by sympathy and loyalty to neighbors, friends and relatives of the South, the General Assembly enacted Ch. 5 of the Laws of 1864 providing for a special election "for the taking of the sense of the people upon the call of a Convention to frame a new Constitution and Form of Government for this State" and at the same election to provide for the election of delegates to the convention. This call for a convention was not under or in accord with the Constitution of 1851 which provided in Art. XI for the

---

6. The roster of delegates elected to serve in the 1850 convention lists nine delegates with names identical to those of nine incumbent members of the 1849 General Assembly and two with the same surname.

taking of a vote on the question of calling a constitutional convention after each ten-year federal census, the vote to be taken at the election for delegates to the General Assembly. If the vote turned out aye, the Legislature then was to provide for the election of delegates. There was no other provision for participation by the General Assembly in the amendatory process. The records show that fifteen members of the General Assembly were elected at a special election not provided for by the then constitution and sat as delegates. Chapter 5 of the Laws of 1864 provided that "any Senator or Delegate may be eligible to a seat in said Convention." The constitution proposed by the convention was approved only by counting in the absent soldiers' vote which was declared to be almost unanimous in approval. Andrews, *History of Maryland* 554.

The Declaration of Rights of the 1864 Constitution, Art. 35, prohibited any person from holding more than one office of profit. By Art. XI it provided three ways of amendment. One was by passage of particular amendments by the Legislature with submission to the voters for ratification. The second provided that, whenever two-thirds or more of the General Assembly thought a convention was necessary, the question be submitted to the people and, if the people agreed, there should be an election of delegates to the convention. The third provided for the taking of the sense of the people every twenty years on the point at a general election and a subsequent legislative response to a favorable vote by the calling of a convention and the election of delegates.

The 1867 convention came about largely from the desire of the people to do away with the test oath required for suffrage by the 1864 Constitution which was approved as to legality in *Anderson v. Baker, supra.* So great was the popular pressure for quick action that the Legislature again ignored the three ways of proceeding set out in the 1864 Constitution and by Ch. 327 of the Laws of 1867, called for a "vote on the question of a call of a Convention to frame a new Constitution and form of Government" and for the assembling of a convention and the election of delegates (in which clergymen, members of Congress, judges, state's attorneys and other officers, but not legislators, could not seek election as delegates). Four members

of the Legislature of 1867 served as delegates to the Convention of 1867 including the president of the Convention, Richard B. Carmichael, a resident of Queen Anne's County, who had been dragged from his judicial bench in Talbot County in 1862 by Union soldiers and put in prison (having finally been released without being brought to trial).

The Convention of 1867 and the subsequent approval of the voters produced the constitution under which, with amendments, we have since lived. The three earlier constitutions each had provided for alteration or change as therein specified. Perhaps because these prior constitutional provisions had successively been honored in the breach more than in the observance, when the Constitution of 1867 was proposed and adopted, it made no provision for complete amendment save to provide (§ 2 of Art. XIV) that it should be the duty of the General Assembly "to provide by Law" for taking at the general election of 1887 "and every twenty years thereafter" the sense of the people in regard to calling a convention for altering the constitution (the present section, amended in 1956, makes 1970 the next year for a taking of the sense of the people) and, if the people vote for a convention, to provide for its assembling and the election of delegates. The sense of the people to call a convention has on several occasions been ignored by the Legislature ostensibly, at least once, because of a legal opinion that a majority of the voters voting at the general election must ask for a convention and this had not occurred although a majority voting on the particular question of whether to call a convention had approved a call.

Instead of providing for required ways for complete revision or amendment under its terms, the Constitution of 1867 by Art. 1 of the Declaration of Rights set forth ringingly:

"That all government of right originates from the people, is founded in compact only, and instituted solely for the good of the whole; and they have at all times, the inalienable right to alter, reform or abolish their Form of Government, in such manner as they may deem expedient."

The people of Maryland from 1776 until today have shown·

that they concur in the generally prevailing view, which we believe to be sound, that the people retain the sovereign power to rewrite their constitution, that the legislative processes which lead to and assist in the exercise of that power are not a part of the previously bindingly delegated powers conferred on the Legislature by the people, that those who are selected to sit in convention and do the rewriting of the Constitution are selected directly by the people and therefore are the direct agents of the people, rather than agents of the organized government, which is the State. The people also have shown that in their opinion, which we share, the offices which are rationed by the constitution one to a customer or the office which may not be held by one who helped create the office are offices which are established by the Constitution or by a law which implements or aids the execution of executive, legislative or judicial functions created by the Constitution, and that an agent of the people who helps create a new constitution does not hold an office within that category. These prior views and actions of the people are entitled to great respect and have aided us greatly in reaching the conclusion that a delegate is not a constitutional officer.

More support for that view is furnished by a consideration of the guiding standards that the cases have evolved to test whether a position is an office. These tests were reiterated in *Moser v. Howard County Board,* 235 Md. 279, 281, in this wise: 1. the position was created by law and casts upon the incumbent duties which are continuing in nature and not occasional; 2. the incumbent performs an important public duty; 3. the position calls for the exercise of some portion of the sovereign power of the State; 4. the position has a definite term, for which a commission is issued, a bond required and an oath required; 5. the position is one of dignity and importance.

Certainly a delegate to a constitutional convention performs a highly important public duty of great dignity. However, the position he holds was not, under the principles which we see as controlling, one created by law as the term law is used in the definition. The duties a delegate performs are in a sense "continuing in nature and not occasional" and in a way the position "has a definite term," but only four constitutions have been adopted in Maryland in one hundred ninety-one years and

the making of a constitution which, like the century plant, has taken a hundred years to bloom may fairly be said to be occasional. A delegate to a convention, like the male honeybee who mates and dies (Maurice Maeterlinck, *The Life of the Bee* (1964 Ed.), p. 194—"the unique kiss of an instant that shall wed him to death no less than to happiness"), performs his creative duty and then ceases to exist as a public functionary since the position of delegate to the convention of which he is a member ends with the convention. The idea of continuity contemplated by the ordinary test for an office is lacking in the case of a delegate to a convention.

Most importantly, a delegate does not exercise any part of the sovereign power of the State—that is, any part of the sovereignty delegated by the people through their constitution to the executive, legislative or judicial branches of the government, even though, we may assume, he does exercise some part of the sovereign power retained by the people and by them committed to him to help create a new constitution.

Various courts have shared the concept we hold of the status of a delegate. In *State v. Doyle* (La.), 70 So. 322, 323, it was said:

> "Such delegates [to constitutional conventions] are agents of the people chosen to represent their constituents for a particular public purpose. They have never been styled officers, and hold no office in the sense of the Constitution. A constitutional convention is not a co-ordinate branch of the government. It exercises no governmental power, but is a body raised by law, in aid of the popular desire to discuss and propose amendments, which have no governing force as long as they remain propositions."

See also *State v. Rogers* (La.), 70 So. 863, and *Baker v. Moorhead* (Neb.), 174 N. W. 430, 432 ("They [the delegates] are not constitutional officers in a strict sense; they are officers who create a Constitution rather than officers who are created by the Constitution"). In *Chenault v. Carter* (Ky.), 322 S. W. 2d 623, 626, the Court held that the choice of whether a convention should be called rested ultimately entirely with the electorate and said: "The delegates to the convention are the agents

not of the legislature, but of the people themselves." *Frantz v. Autry* (Okla.), 91 Pac. 193, held that (p. 202) :

> "* * * In a territory, the source of all power is Congress. But in the formation of a Constitution and state government the power emanates from the people. The delegates to the convention were not the agents or representatives of Congress [i.e., the existing government] but they were the immediate agents and representatives of the people of the two territories. They derived their power and authority from the people in their sovereign capacity."

Hoar, *op. cit.* p. 186, in indicating disagreement with the position of Jameson (*op. cit.* pp. 317-20) that a delegate to a convention is an officer, says : [7]

> "The position of delegate to the Illinois convention was undoubtedly a position of public trust, and even a public office; but was not, if we regard such conventions as extraconstitutional, a position under the constitution. When a constitution refers to the incompatibility of offices, such provisions should be construed as relating solely to positions under the constitution itself and not to apply to any other positions unless clearly so stated."

Hoar then quotes an opinion of an Attorney General of Massachusetts as follows (p. 187) :

> " 'It is my view that the word "office," as used in article VIII of the Amendments, refers to a position the incumbent of which exercises some power of government, and not to the position of a person selected to act in an advisory capacity in framing a scheme or change of government to be submitted to the people for adoption or rejection.' "

---

7. Jameson devoted his book to showing that the Illinois Legislature was superior to and supreme over the pending Illinois constitutional convention and this devoutly missionary point of view colored his reasoning and conclusions on many points.

Hoar comments:

> "It does not appear necessary to debase the convention in this way in order to reach his [the Attorney General's] conclusion. It would be sufficient to hold that the word 'officer' in the constitution means *constitutional* officer."

The disposition of the matters involved in questions (h) and (i) requires little discussion. The form of both questions shows that necessarily they were submitted by the Legislature on the premise that it, in its discretion, could either call or not call a convention "at this time" or delay the call for two years. The parties, we must assume, proceeded before the Circuit Court on the agreement that this premise which was implicit in questions (h) and (i) was correct for Judge Evans in his opinion said: "It is undisputed that the General Assembly has the inherent power to call a Constitutional Convention at any · time.[8]

In answering the claim that the calling of a convention was not mandatory because the number of voters favoring a convention was not a majority of all who voted on September 13, and therefore the vote was not in favor of a convention, Judge Evans pointed out that the election was not held pursuant to Article XIV, § 2, of the Constitution but by Chapters 500 and 501 of the Laws of 1966, enacted under the inherent power to call a convention at any time and the provisions of § 2 of Art. XIV did not apply, and that the election was a special elec-

---

8. The authorities almost unanimously agree that a state legislature has the inherent power to call for a convention at any time, where the constitution is silent on the subject or where a permissive periodic interval for such a calling is established in the existing constitution. See Jameson, *Constitutional Conventions*, §§ 219, 394-403, 570, 571, 574; Dodd, *The Revision and Amendment of State Constitutions*, p. 44 ("It has now become the established rule that where the constitution contains no provision for the calling of a convention, but has no provision expressly confining amendment to a particular method, the legislature may provide by law for the calling of a convention"); Hoar, *Constitutional Conventions*, Ch. V; Cooley, *Constitutional Limitations* (8th Ed.), p. 85; In re Opinion to the Governor (R. I.), 178 Atl. 433; City of Bessemer v. Birmingham Electric Co. (Ala.), 40 So. 2d 193, 197.

tion at which the only issue presented was whether or not to call a convention and those favoring the call did constitute a majority of those voting at that election. He said:

"The use of the words 'special election' throughout these two Acts [Chapters 500 and 501 of the Laws of 1966] makes it clear that the referendum as to the calling of a Convention was not part of the primary election. It was an entirely separate election, at which only the one question was in issue. The majority vote on that one question constituted a majority vote at the entire election. Persons unaffiliated with either political party were permitted to vote on this one question; this makes inescapable the conclusion that it was not part of either party primary, but a separate special election.

"Several courts have sustained the proposition that a special election may be held concurrent with a general election without losing its separate and special character. In *Houston v. Boltz* (1916), 169 Ky. 640, 185 S. W. 76, a special election to approve the issuance of bonds, though held simultaneously with a general election, was still declared to be special. The Court stated, at page 78:

'It would seem, therefore, that holding the election on a day different from the regular election day is not one of the essentials of a special election. When, therefore, section 157a of the Constitution provided that the vote on the road-bond issue should be taken at a special election, held in such manner as may be provided by law, and the law upon the subject does not require the election to be held upon a day different from the general election day, it follows that the special election may be held upon the general election day. It is nevertheless a special election, because it has been specially called for the purpose of voting upon a proposition specially submitted. And we see no reason why the proposition submitted should not be printed upon the

ballot used in the general election held upon the same day.'

See also *Eberhardt Const. Co. v. Board of Com'rs.* (1917), 100 Kan. 394, 164 Pac. 281; *Munce v. O'Hara* (1940), 340 Pa. 209, 16 A. 2d 532; *Derryberry v. State Board of Election Com'rs.* (1924), 150 Tenn. 525, 266 S. W. 102.

"One of the intervenors [the individual defendant] attacked the validity of the special election, contending it was not properly advertised and, therefore, there was only one election and Chapters 500 and 501 did not receive a majority of the votes cast at the election. [The intervenors' argument goes on to say that] the issue not having received a majority of the votes cast, the General Assembly is not required to call a Constitutional Convention.

"Chapters 500 and 501, on their faces, show that they were to be voted on at a special election. The stipulation and exhibits clearly show that if the various advertisements did not meet with the letter of the law, it was substantially complied with and voters in every part of the State received actual notice of the special election. At this point, the law requires no more. [*Dution v. Tawes,* 225 Md. 484]

"The character of the referendum as a special election distinguishes it from the referenda held at general elections under Article XIV, Section 2, and makes the majority affirmative vote a direct mandate of the people.

"The final question to be considered is: (i) can the calling of the Constitutional Convention be delayed by a period of two years?

"By enacting Chapter 501 of the Acts of 1966, the General Assembly put to the electorate the question 'whether there shall be called a Convention not earlier than 1 September 1967 and not later than 1 September 1968,' and by enacting Chapter 500, put to the electorate the question whether the Convention shall be assembled on 13 September 1967. Both Chapters

500 and 501 were approved by the voters by a 5-to-1 vote. The convention was called by the Legislature and confirmed by the people. The General Assembly cannot ignore this mandate.

"It is true that the General Assembly did not have to take the sense of the people in 1966. But having submitted the question to the people in proper legal fashion, it bound itself to the mandate expressed by them. The people have spoken in clear and unmistakable terms, and the Legislature is bound to obey. The only thing remaining to be done is to provide for the election of delegates."

We agree generally with Judge Evans' views on questions (h) and (i) and from this and what we have said earlier in this opinion it is apparent why we affirmed his order that it was mandatory that a convention be called at this time and that the call could not be delayed. Since the passage of the order below and the affirmance in this Court the Legislature by Ch. 4 of the Laws of 1967 has provided for the early call of a convention and established the mechanics for the election of delegates on June 13 of this year and their subsequent meeting on September 12. Questions (h) and (i) have in effect become moot and any further discussion of them would not, as we see it, be fruitful.

BARNES, J. dissenting:

I dissent because I disagree with the answers given to all of the questions considered in the majority opinion, although I do agree with the majority that the lower court and this Court had jurisdiction to consider and determine the questions propounded for the reasons set forth in the majority opinion. I am of the opinion that both Chapters 500 and 501 of the Acts of the General Assembly of Maryland are unconstitutional as being in conflict with the provisions of Article XIV, Section 2 of the Maryland Constitution providing for the taking of the sense of people of Maryland in regard to the calling of a Constitutional Convention at the general election of 1970.

In my opinion the most important question—inherent in

Question (i) propounded to us—is whether Chapters 500 and 501 are *rendered unconstitutional* because they conflict with Article XIV, Section 2 of the Constitution. If these Acts are unconstitutional, obviously the proposed Constitutional Convention cannot be held on September 12, 1967 or indeed, *upon the call of the General Assembly*, until it has taken the sense of the people in regard to such a call at the *General Election of 1970 and a majority of voters at such election shall vote for a convention*. In other words, I would have answered Question (i)— "Can the calling of a Constitutional Convention be delayed by a period of two years?" "Yes, and it *must* be delayed until the conditions required by Article XIV have been fulfilled." It would then not have been necessary to answer any of the other questions at this time.

Both the lower court and the majority of this Court have given primary consideration to the question of whether or not delegates of the proposed Constitutional Convention would hold no "office under the Constitution or laws of this State" as the most important question presented. Counsel for the original parties also so considered it and the very helpful briefs filed on behalf of those parties gave it careful and exhaustive attention. Counsel for the intervening defendants, however, raised, briefed and argued other questions in regard to the validity of holding the Convention on September 12, 1967.

Although the issue of whether or not delegates are "officers" may well have been of primary importance as a practical political matter—possibly to induce the General Assembly to pass the enabling legislation at the 1967 Session—it is to my mind, rather unimportant so far as the basic constitutional issues are concerned. I say this because even if it had been decided by the majority of the Court that delegates to the Constitutional Convention were such officers, it would not, in my opinion, have prevented the Constitutional Convention from meeting but would only have excluded the present members of the General Assembly and others from being members of the Constitutional Convention, as will be more fully considered when this issue is considered later in this opinion. In view of the fundamental character of the question of the constitutionality of Chapters 500 and 501, I will consider this issue first.

*I.*

*Unconstitutionality of Chapters 500 and 501 of the Acts of 1966 as being in conflict with Article XIV, Section 2 of the Maryland Constitution.*

Article XIV of the present Maryland Constitution provides as follows:

"Section 1. *Proposal in General Assembly; publication; submission to voters; Governor's proclamation.*

The General Assembly may propose Amendments to this Constitution; provided that each Amendment shall be embraced in a separate bill, embodying the Article or Section, as the same will stand when amended and passed by three-fifths of all the members elected to each of the two Houses, by yeas and nays, to be entered on the Journals with the proposed Amendment. The bill or bills proposing amendment or amendments shall be published by order of the Governor, in at least two newspapers, in each County, where so many may be published, and where not more than one may be published, then in that newspaper, and in three newspapers published in the City of Baltimore, once a week for four weeks immediately preceding the *next ensuing general election,* at which the proposed amendment or amendments shall be submitted, in a form to be prescribed by the General Assembly, to the qualified voters of the State for adoption or rejection. The votes cast for and against said proposed amendment or amendments, severally, shall be returned to the Governor, in the manner prescribed in other cases, and if it shall appear to the Governor that a *majority of the votes cast at said election on said amendment or amendments, severally,* were cast in favor thereof, the Governor shall, by his proclamation, declare the said amendment or amendments having received said majority of votes, to have been adopted by the people of Maryland as part of the Constitution thereof, and thenceforth said amendment or amendments shall be part of the said Constitution. When two

or more amendments shall be submitted in manner aforesaid, to the voters of this State at the same election, they shall be so submitted as that each amendment shall be voted on *separately*.

Section 2. *Constitutional conventions.*

It shall be the duty of the *General Assembly to provide by Law for taking, at the general election to be held in the year nineteen hundred and seventy, and every twenty years thereafter, the sense of the People in regard to calling a Convention for altering this Constitution; and if a majority of voters at such election or elections shall vote for a Convention*, the General Assembly, at its next session, shall provide by Law for the assembling of such convention, and for the election of Delegates thereto. Each County, and Legislative District of the City of Baltimore, shall have in such Convention a number of Delegates equal to its representation in both Houses at the time at which the Convention is called. But any Constitution, or change, or amendment of the existing Constitution, which may be adopted by such Convention, *shall be submitted to the voters of this State, and shall have no effect unless the same shall have been adopted by a majority of the voters voting thereon.*" (Emphasis supplied)

Article 1 of the Declaration of Rights provides:

"That all Government of right originates from the People, is founded in compact only, and instituted solely for the good of the whole; and they have, at all times, the inalienable right to alter, reform or abolish their Form of Government in such manner as they may deem expedient."

Our predecessors have held that the Declaration of Rights and the body of the Constitution are to be construed as one document, *Mayor & C. C. of Baltimore v. State, ex rel. Board of Police of the City of Baltimore,* 15 Md. 376 (1860), and if the provisions of the body of the Constitution are clear and unambiguous those provisions are to be taken as a limitation upon the general principles declared in the Declaration of Rights. *An-*

*derson v. Baker,* 23 Md. 531, 628 (1865). Construing Article 1 of the Declaration of Rights and Article XIV of the body of the Constitution together, it seems clear to me that a Constitutional Convention can, under Article 1 of the Declaration of Rights be called *by the direct action of the people themselves* at any time. Although this is difficult of practical accomplishment, it could be done, for example, by a petition of a *majority of the electorate* that a Constitutional Convention be called. Action in regard to changes in the Constitution or in the *call* of a Constitutional Convention *by the General Assembly*—as contrasted by direct action by the people themselves—is strictly limited by Article XIV of the body of the Constitution.

Section 1 of Article XIV makes clear and quite definite the procedure to be followed by the General Assembly in *proposing amendments* to the Constitution. This procedure requires an affirmative vote of three-fifths of both Houses in favor of the proposed amendment, recorded in their respective Journals, adequate publication of the text of the proposed amendment, and submission to the electorate at the *"next ensuing general election,"* for adoption or rejection. Section 1 provides that if a "majority of the votes cast at said election *on said amendment or amendments"*, and if it appears to the Governor that a majority of the votes cast thereon were in favor thereof, the Governor shall declare that the amendment has been adopted, and thereafter, the amendment becomes part of the Constitution. These provisions of Section 1 have been held by our predecessors to be *mandatory* and not directory, *Hillman v. Stockett,* 183 Md. 641, 39 A. 2d 803 (1944).

Section 2 of Article XIV mandatorily imposes the duty *on the General Assembly* to take "at a *general election* to be held in the year nineteen hundred and seventy, and every twenty years thereafter, the *sense of the People* in regard to *calling* a Convention for altering the Constitution; and if a majority of *voters at such election* or elections *shall vote for a Convention,* the General Assembly, at its *next* session, *shall provide by Law* for the assembling of such Convention * * *." When a proposed new Constitution is framed by the Convention it "shall be submitted to the voters of this State and *shall* have no effect unless the same *shall* have been adopted by a majority of voters *voting thereon.*

The original provision of Article XIV in the Constitution of 1867 was that the sense of the people should be taken at the general election in 1887 and every twenty years thereafter. The date "1887" was changed to "1970" by an amendment adopted by the electorate in 1956. In other words, the people considered the very problem of a *legislative taking of the sense of the people to call a Constitutional Convention* not quite 21 years ago and decided that no such action by the General Assembly should take place until 1970 *at the earliest.*

This Court has held that the language of the Constitution was carefully chosen by its draftsmen and that the Courts should give great importance to the actual words used in construing the Constitution. *Buchholtz v. Hill,* 178 Md. 280, 13 A. 2d 348 (1940).

The lower court was of the opinion that the General Assembly had *implied powers* to take the sense of the people at times other than as specifically prescribed for in Section 2 of Article XIV. Curiously enough, the majority of this Court apparently adopts this position and quotes from the lower court's opinion to that effect, notwithstanding the citation in Note 8 of the authorities indicating that such "implied powers" or "inherent power" supposedly exists (quoting from Dodd, "The Revision and Amendment of State Constitutions", p. 44) "where the Constitution contains no provisions for the calling of a convention, but has no provision expressly confining amendment to a particular method * * *."

As has been pointed out, in the Constitution of 1867 there is *both* a provision "expressly confining amendment to a particular method in Section 1 of Article XIV *and* there is also a provision for the calling of a Constitutional Convention in Section 2 of Article XIV.

It seems manifest that the General Assembly has no "inherent" or "implied" power to do an act *directly contrary to the express provisions of the Constitution itself.* If the contrary should ever be the law, the death-knell of constitutional government will have been sounded, as one of the principal reasons for a written constitution is to impose limits on the power of government in order to protect the liberty of the individual citizen. If the legislative branch of the State government can, at will, dis-

regard express limitations in the Constitution, we will have reverted to the British system of absolute parliamentary supremacy from which I had thought we had happily escaped by the success of the War for American Independence, the establishment of State and the Federal Constitutions and the enforcement of limitations in those documents by the Courts. There simply cannot be any inherent or implied powers in the General Assembly contrary to the express provisions of the Constitution itself.

As Judge Offutt, for the Court, stated in *Brawner v. Supervisors of Elections,* 141 Md. 586, 604, 119 Atl. 250 (1922):

> "The people adopted the Constitution and the people alone can change it, and while it stands unchanged it is the supreme law binding and controlling this Court as well as every other department of the State's government and its people, and when changed conditions make it desirable to amend its provisions, the amendment must be made in accordance with and not in violation of its mandates."

Judge Delaplaine, for the Court, stated in *Johnson v. Duke,* 180 Md. 434, 442, 24 A. 2d 304, 308 (1942):

> "It is the sacred duty of the Courts to preserve inviolate the integrity of the Constitution. Hence it would be a violation of their duty to treat the fundamental law as subject to modification except in the conformance with constitutional methods."
>
> * * *
>
> "The Constitution of the State is a higher authority than any act or law of any officer or body assuming to act under it, for such an officer or body must exercise a delegated authority subservient to the basic law by which the delegation was made. In case of conflict the Constitution must govern, and the act or law in conflict with it must be held to have no legal validity."

Jameson on *Constitutional Conventions* (4th ed. 1887), § 574 f, pages 617-618, states the following:

> "To determine the degree of strictness with which constitutional provisions authorizing the call of Con-

ventions must be pursued, in the absence of restrictive words, mandatory in their effect, is more difficult. 1. If the position hereinbefore taken be correct, that a legislature, under our constitutional system, has power to call a Convention to amend or revise the Constitution, though not expressly authorized, the case presented by the facts supposed would be this : A legislature having a general power to call a Convention, at its discretion, is expressly given power to do the same thing under certain conditions. What inference is warranted as to the intention of the people in imposing those conditions ? Obviously, that they were not content longer to leave so important a power to the unlimited discretion of the legislature, but desired to restrict it by express declarations of their will as to the time when, the purpose for which, and the number and character of the voters by whom, a Convention might be called. If this inference be just, the conditions laid down for the exercise of the power become, in effect, positive prohibitions upon its exercise in any other way, in conformity to the maxim, good both in civil and the common law, *expressum cessare facit tacitum*. In this reasoning, the people of the United States have generally, I might say universally, acquiesced, though occasional attempts have been made, under strong temptation, to induce the legislatures of some of the States to discredit it. Thus, the Illinois Constitution of 1848 provided, that whenever two-thirds of all the members elected to each branch of the General Assembly should think it necessary to alter or amend the Constitution, they should recommend to the electors at the next election of members of the General Assembly to vote for or against a Convention; and if it should appear that a majority of all the electors of the State voting for representatives had voted for a Convention, the General Assembly, at their next session, should call a Convention. In 1867, members of the dominant party in the State, desiring an early change of the Constitution, and impatient of the delay necessitated by its

strict terms, attempted to carry through an act to call a Convention by what was styled 'a short cut,' that is, upon a vote of the people alone, omitting a reference of the subject to the next session of the General Assembly to make the call, should that vote favor it, as required by the Constitution. Happily, the scheme was defeated, and the wiser course taken of obeying to the letter the supreme law of the State."

Not only is there no implied or inherent power *by the General Assembly* to take the sense of the people and then call a Constitutional Convention otherwise than as provided in Section 2 of the Constitution as a general principle, but the history of Article XIV in prior Constitutions and of its adoption by the Constitutional Convention which drafted the present Constitution of 1867 shows conclusively to me that there was no intention that the General Assembly should have this power.

The Constitution of 1776 contained no provision for the taking of the sense of the people and for the calling of a Constitutional Convention. Article LIX of that Constitution provided that a change in it could be made by a bill passed by the General Assembly and provided it was passed at least three months before a new election of delegates to the General Assembly and was confirmed by the General Assembly containing those newly elected delegates. Pursuant to this provision the Constitution of 1776 was amended in 1792, 1795, 1798, 1803, 1805, 1807, 1809, 1810, 1812, 1837 and 1846.

In the Constitution of 1851 the forerunner of Section 2 of Article XIV appeared as Article XI of that Constitution and provided, in relevant part, as follows:

"It shall be the duty of the legislature, at its first session immediately succeeding, ascertaining, at the next *general election* of delegates, the sense of the people of Maryland in regard to the calling of a Convention for altering the Constitution, and in case the *majority of votes cast at said election* shall be in favor of calling a convention, the legislature shall provide for assembling such Convention * * *." (Emphasis supplied)

In the Constitution of 1864, Article XI of that Constitution contained three provisions in regard to constitutional changes. Section 1 was almost identical with Section 1 of the present Constitution in regard to amendments to the Constitution.

Section 2, however, was quite significant. It prescribed:

"Whenever two-thirds of the members elected to each branch of the General Assembly shall think it necessary to call a convention to revise, amend or change this Constitution, they shall recommend to the electors to vote at the *next election for members of the General Assembly* for or against a Convention; and if a *majority of all the electors voting at said election* shall have voted for a Convention, the General Assembly shall at their next session, provide by law for calling the same." (Emphasis supplied)

Section 2 then provided that the convention shall consist of as many members as there are members of both houses of the General Assembly and that the Convention shall meet within three months of this election.

Section 3 is quite similar to Section 2 of Article XIV of the present Constitution and provided as follows:

"At the *general election* to be held in the year one thousand eight hundred and eighty-two and in each twentieth year thereafter, the question, 'Shall there be a convention to revise, alter or amend the constitution,' shall be submitted to the electors of the State, and in any case a *majority of all the electors voting at such election* shall decide in favor of a convention, the general assembly at its next session shall provide by law for the election of delegates and the assembling of such convention, as is provided in the preceding section; but no amendment of this constitution agreed upon by any convention assembled in pursuance of this article shall take effect until the same shall have been submitted to the electors of the State, and adopted by a majority of those voting thereon." [1] (Emphasis supplied).

---

1. The report of the Committee on Future Amendments to the

In the present Constitution of 1867, the substance of Sections 1 and 3 of Article XI of the Constitution of 1864 was retained, but the provisions of Section 2 in regard to submitting the question of a call for a Constitutional Convention by the *General Assembly* to the people was entirely eliminated. This can only mean that the draftsmen of the Constitution of 1867 *did not intend* that the General Assembly should thereafter have the power delegated to it by Section 2 of the 1864 Constitution, but should be confined to the power and duty given it by Section 3 of the 1864 Constitution which, in substance, became Section 2 of Article XIV of the present Constitution.

There was good reason to remove the formerly delegated power *to the General Assembly* to submit the issue of a call for a Constitutional Convention at any time to the people.

As several of the authorities cited in the majority opinion indicate, the preparation and adoption of a new Constitution is a "peaceful revolution." Revolutions, whether peaceful or accomplished by force, are upsetting, productive of much litigation, expensive and are only resorted to as a last resort when conditions under the established Constitution or government have become so intolerable that a change must be made. As the Declaration of Independence aptly stated: "Prudence, indeed, will dictate that Governments long established should not be changed for light and transient causes," and that experience had shown that "mankind are more disposed to suffer, while evils are sufferable, than to right themselves by abolishing the forms to which they are accustomed * * *." Much of the Declaration of Independence is given over to listing the oppressions, usurpa-

---

Constitution was submitted to the 1864 Convention on May 27, 1864. See "Proceedings of the Maryland Constitutional Convention," p. 119. There were attempts to amend the proposed draft by changing the required legislative majority in Section 2 from "two-thirds" to "three-fifths"; an amendment of Section 2 to provide that the legislature should not impose restrictions as to the qualifications of delegates to the Convention; a change in Section 3 from 1882 to 1872 and a change in the 20-year requirement in Section 3 to a 10-year requirement. All of these proposed amendments were rejected by the Convention. Id. pgs. 375 to 377. The report of the Committee was adopted as originally submitted by a substantial affirmative vote. Id. p. 388.

tions, cruelties and outrageous conduct by the British Government which justified the Colonies in separating from the mother country.

When the Constitution of 1867 was adopted, Maryland had had *three* Constitutions in sixteen years. This was in itself upsetting to the orderly and regular processes of government. By providing for the submission of *amendments at any time* by the General Assembly and for a taking of the sense of the people for a Constitutional Convention every twenty years and the calling of such a Convention if a majority of votes cast at a *general election* favored such a call, the people had given all of the power necessary or thought to be expedient for changes in the Constitution. All other power for such changes was reserved to the people themselves and could not be exercised by the General Assembly.

As indicated in the majority opinion, the power to amend the 1867 Constitution has been freely—in the opinion of many, too freely—exercised by the General Assembly, there having been 203 amendments adopted since 1867. This is an average of over two a year since its adoption. This hardly indicates that the will of the people in the face of changed conditions has not been made effective. The remarkable programs of public works and other activities by various State administrations operating under the present Constitution conclusively indicate that the governmental powers granted by the present Constitution are ample to insure the growth and well being of proper State programs. Nothing appears in the record in this case—nor have I heard—any contention that any citizens have been oppressed, any rights denied, any legitimate interests adversely affected or impaired by the present Constitution, as so amended. If any such conditions should arise, undoubtedly they could be cured by amendment. It had been alleged that the present Constitution is not a tidy instrument, that it is too long, too detailed, contains unclear and obsolete language and the like. But these adverse criticisms—if legitimate—in my opinion, go to matters of form and not to matters of substance. In any event, they are such matters as could well wait until 1970 in order to ascertain whether a *majority* of the voters at a *general election* believe that they are sufficiently important to justify the calling of a Constitutional

Convention to draft a new Constitution, with its attendant expense, subsequent litigation and generally upsetting effect. No doubt the draftsmen of the 1867 Constitution had these factors in mind, and deliberately removed from the General Assembly and reserved to the people themselves, the power to issue a call for a Constitutional Convention except as provided in Section 2 of Article XIV. The authorities appear to confirm my opinion in this regard, as the maxim, *"Expressio unius est exclusio alterius"* is applicable to the construction of constitutional provisions. See *O'Connor v. Armstrong,* 299 Pa. 390, 149 Atl. 655 (1930) ; *Harbert v. Harrison County Court,* 129 W. Va. 54, 39 S. E. 2d 177 (1946) ; *Yelle v. Bishop,* 55 Wash. 2d 286, 347 P. 2d 1081 (1959) ; *Whitney v. Bolin,* 85 Ariz. 44, 330 P. 2d 1003 (1958). See also 16 C.J.S. *Constitutional Law,* § 21, page 89.

It should be observed that Chapter 501 of the Acts of 1966 purports "to take the sense of the voters of this State," as appears in the title and the body of the Act, using almost the same language as appears in Section 2 of Article XIV of the Constitution.

*II*

*The calling of a Constitutional Convention is not mandatory because those voting "for" the call did not constitute a majority of those voting at the election.*

This issue was presented by Question (h). As I have already indicated that the Constitutional Convention cannot at this time be called *at all,* it is, of course, not necessary to answer the question. Since the issue was pressed and argued by the intervenors, I think it should be answered.

In my opinion, apart from the unconstitutionality of Chapters 500 and 501 already mentioned, I am of the opinion that the General Assembly had no power whatever to take the sense of people at any *special election,* whether conducted by itself or as a part of a primary election. The "sense of the voters" means the sense of a majority of the electorate. Our past experience has indicated that the majority of the electorate is present at *general elections* and not at primary or special elections. Assuming, for the argument, that the General Assembly had inherent or implied power to issue the call, there is most certainly no inherent or implied power to submit the issue at any

election other than a general election. Without exception in every prior constitution both amendments and the taking of the sense of the people for a Constitutional Convention have been required to be presented to the electorate at a general election. Laws referred to the people by Referendum pursuant to Article XVI of the present Constitution must be submitted to the electorate at a general election. Why? Obviously because such an important change in the basic law of this State should not be made or brought to pass by a small minority of the electorate. To permit submission of such basic constitutional changes at other than a general election frustrates the very concept of majority rule. The requirement of the necessity of a majority vote of the electorate at a general election is even more important when considering the call of a Constitutional Convention and without exception every Constitution providing for such a call has required that a majority of those voting at the general election vote in favor of the call.

In the course of debate on this question at the Constitutional Convention in 1851, Alexander Randall of Anne Arundel County aptly observed:

> "If there should be a majority of the people in favor of such a change, and desirous of calling a Convention, and if such Convention should be called, then the chances were greatly in favor of the adoption of the Constitution framed by it. On the other hand, the chances were very much against the adoption of a Constitution, the work of a Convention called into existence by a mere majority of the voters who may have cast their votes in favor of such a course over those who cast their votes against it, regardless of the fact that those who voted for the Convention, and it may be united even with those who voted against it, that all who then voted on the subject did not constitute a majority of the voters of the State." Vol. 2, "Debates of Maryland Constitutional Convention," 1851, page 378.

I know of no authority for the submission of a call of a Constitutional Convention at any election other than a general election and none is cited in the opinion of the lower Court or in

the majority opinion of this Court. The results in this very case graphically show that only a small minority of the electorate who voted in the general election of November 8, 1966, or even of those who voted in the "primary-special" election of September 13, 1966, voted in favor of the call. From Exhibit 1 filed in the lower court by Joshua F. Cockey of B., the individual intervenor, and other data, the following appears, taken from the figures prepared by the Office of the Secretary of State on the September 13, 1966 Maryland Primary Election and on the November 8, 1966 General Election.

In the Primary Election of September 13, 1966, there were cast, statewide, for Governor a total of 609,747 votes, while only 191,960 votes were cast on the Convention Question. so that only approximately 31.5% of the votes cast at that election were cast either for or against the calling of a Constitutional Convention. Of the 191,960 votes on the question 160,280 were for the call and 31,680 were against, so that only approximately 26.3% of those voting at the primary election for Governor voted in favor of the call. Only 11.5% of the registered voters of Maryland as of August 15, 1966 voted for the call of a Convention.

At the general election of November 8, 1966, 919,760 votes were cast for Governor. Of those voting at that election, 538,360 voted on the Bay Bridge Question presented by referendum, or 58.5% of those voting for Governor in that election. If the proposed call had been presented to the voters at the general election of November 8, 1966, a majority of 459,881 votes would have been required for the approval of the call—a far cry from the 160,280 votes cast for it at the primary election of September 13, 1966. What possible legal justification can there be for purporting to take the "sense of the voters" at a "primary-special" election—known to have a smaller vote than the vote cast at a general election—when only some eight weeks later there would be a general election in the State at which the call with other issues, could have been submitted, and the real sense of the people taken? I conclude that the sense of the voters has not yet been taken or received by the General Assembly and the attempt to take it at a "primary-special" election was unconstitutional and abortive.

It seems clear that under a provision for the calling of a Con-

vention if the majority of the electors voting at a general election shall decide in favor of calling a Convention, the proposal must be adopted by a majority of the qualified electors voting at the election and not merely by a majority only of the electors voting on the proposal itself. See *Stoliker v. Waite*, 359 Mich. 65, 101 N. W. 2d 299 (1960) ; *People v. Alger*, 323 Mich. 523, 35 N. W. 2d 669 (1949).

Assuming *arguendo*, that Chapters 500 and 501 of the Acts of 1966 were constitutional, in my opinion, the intervenors are correct in their position that in the absence of a majority of those voting in the election of September 13, 1966, it was not mandatory upon the General Assembly to call the Constitutional Convention. The call was submitted to the voters at the primary election of September 13, 1966. This election was in fact all one election and it cannot be fragmented by calling it a special election to be held at the same time as the primary election. There were only one set of voting places, one group of election officials and, most importantly, the proclamation of the election was not that the call was submitted at a *special election* but was submitted at the *primary election* at *which election* the issue should be submitted. The heading of the proclamation was as follows:

"Proclamation of the Governor of Maryland directing publication of bill to *submit to voters at time of primary election, question of calling Convention* to frame a new Constitution for Maryland." (Emphasis supplied)

In the Governor's order, it was provided:

"I * * * do by my proclamation, order that the aforegoing bill be published * * * not later than *twenty days prior to the primary election* to be held on September 13, 1966, *at which election the proposed question shall be submitted* * * * to the qualified voters of the State for adoption or rejection." (Emphasis supplied)

It is true that in the body of the bill published, Section 1 of Chapter 501 is printed which refers to a special election, but it seems clear to me that the intervenor has established that the

proclamation as a whole indicated that the issue of the call was to be submitted at the primary election and that the independent voters—not allowed to vote at a primary election—could well have concluded that they could not vote at that election.

In addition to the Proclamation, the individual intervenor having denied in his answer that the special election was duly held, offered in evidence newspapers published in Baltimore County and Anne Arundel County—two of the largest counties in the State—in which the primary election of September 13, 1966, was advertised as is required by Code (1957), Article 33, Section 12. Nowhere in these two advertisements were the voters notified that there was any special election on the call of the Constitutional Convention. Article 33, Section 12(a) specifically requires that "the Board of Supervisors in each county *shall* give ten days' notice of the time and place of *all elections* in each precinct of such county by advertisements * * * in at least two newspapers of general circulation in said county * * *" (Emphasis supplied)

A specimen ballot for Baltimore County issued by the Board of Supervisors of Elections of Baltimore County headed "Primary Election, September 13, 1966" was also introduced into evidence. There is not a word in this Specimen Ballot that there was also an alleged "Special Election" to consider the call for a Constitutional Convention. On this Specimen Ballot on the right hand side at the extreme top over the list of primary candidates for Sheriff and Judges of the Orphans' Court is a block under "Question 11, FOR—AGAINST—"Should a Convention be held between September 1, 1967 and September 1, 1968 to draft a New Constitution for Maryland." Curiously, there is no lever provided for this block on the Specimen Ballot either over "For" or "Against". Not only would a voter not know that this was a special election for this issue, but the Specimen Ballot does not even indicate that there is a lever provided with which to make the choice.

The doctrine of "substantial compliance" with the mandatory requirements of the election laws in regard to notice resulting from publicity in newspapers, television, etc. as was invoked in *Dutton v. Tawes,* 225 Md. 484, 171 A. 2d 688 (1961), has not, in my opinion, been sustained in this case as the Proclamation,

the required official newspaper advertisement and the specimen ballot all indicate that the electorate was misled and this showing has not been rebutted. When the electorate has been misled, the doctrine of "substantial compliance" does not apply. As Judge (now Chief Judge) Hammond said, for a majority of the Court, in *Dutton v. Tawes, supra*:

> "All of the cases turn fundamentally on whether the mistake in procedure has caused harm by *misleading the electorate or by tending to prevent or frustrate an intelligent and full expression of the intent of the voters."* (Emphasis supplied) (225 Md. at 495, 171 A. 2d at 693).

In my opinion the electorate was not only misled but intelligent and *full* expression of its intent was most certainly prevented and frustrated. The small vote on the issue of the call clearly indicates this.

### III.

### DELEGATES TO THE CONSTITUTIONAL CONVENTION ARE HOLDERS OF AN OFFICE CREATED UNDER THE CONSTITUTION OR LAWS OF THIS STATE.

I reluctantly disagree with the majority on this issue because I think if the Constitutional Convention can constitutionally be held on September 12, 1967, the presence of a number of members of the present General Assembly as members of the Constitutional Convention would make a substantial contribution to the formulation of the new Constitution to be prepared by the Constitutional Convention for later submission to the electorate for approval or rejection. Many members of the present General Assembly have had great experience in the governmental problems of this State for a number of years, and their advice and counsel would be most helpful in framing a just, effective and well balanced Constitution for Maryland.

In my opinion, however, the members of the proposed Constitutional Convention will hold an "office" or *"an office of profit or trust"* created by the Constitution or laws of this State.

The applicable provisions of the Maryland Constitution—Article 33, Article 35 of the Declaration of Rights, Article I, Section 6, Article III, Sections 11 and 17—have been adequately set forth in the majority opinion and need not be repeated here. I agree with the majority that the "need for and purpose of these provisions manifestly was to protect against conflicts of interest, self-aggrandizement, concentration of power, and the blurring or obliteration of the doctrine of separation of powers in the performance by the agents of the people of their delegated authorities to exercise the executive, legislative and judicial functions of the organized government." Many of the provisions are designed to remove the *temptation* of self-aggrandizement from members of the General Assembly, so that an objective, rather than a subjective, consideration governs those members in creating offices and in creating or increasing the compensation of offices.

Although as the majority opinion points out (and I agree) "the general power of a state legislature to make, alter and repeal laws pursuant to the constitution by which the people created the legislature, does not include the right to make or remake the fundamental laws, the constitution," in the Maryland Constitution, the functions of the General Assembly in regard to amendments to the existing Constitution and in regard to conventions to form a new constitution are, as has already been pointed out, *expressly provided for* in Article XIV, quoted above in full.

It will be observed that delegates to a Convention to form a new constitution are specifically mentioned, as such, in Section 2 of Article XIV and Section 2 does give the General Assembly the power to provide for such delegates when the conditions set forth in Section 2 are met.

Although this Court has never considered this precise question before, our prior decisions indicate to me that a delegate to a Constitutional Convention holds an "office" and an "office of profit or trust."

We have held, without exception, that persons who are *elected by the people* are public officers. In *Buchholtz v. Hill,* 178 Md. 280, 13 A. 2d 348 (1940), our predecessors laid stress on the fact that the Clerk to the Board of County Commissioners of

Allegany County was elected, in holding that he was a public official. See also *Truitt v. Collins*, 122 Md. 526, 89 Atl. 850 (1914) holding a city councilman of Snow Hill to be a public official, and *Howard County Metropolitan Comm'n. v. Westphal*, 232 Md. 334, 193 A. 2d 56 (1963) and *Hetrich v. County Comm'rs. of Anne Arundel County*, 222 Md. 304, 159 A. 2d 642 (1960) holding a county commissioner to be the holder of a public office. The Attorney General has generally advised that elected executives, legislators and judges, receiving compensation, are holders of public office under the Constitution or laws of Maryland.[2]

We and our predecessors have given a broad and comprehensive interpretation to the word "office" in the Maryland Constitution. In 1964 we held that even a notary public was a public officer. *Moser v. Board of County Comm'rs. of Howard County*, 235 Md. 279, 201 A. 2d 365. Prior to *Moser* it has been held that a variety of positions were public offices; in *Howard County Metropolitan Comm'n. v. Westphal, supra*, a member of the Howard County Metropolitan Commission; in *Hetrich v. County Commissioners of Anne Arundel County, supra*, the Anne Arundel County Business Manager; in *State, use of Clark v. Ferling*, 220 Md. 109, 151 A. 2d 137 (1950), the Superintendent of the Maryland State Reformatory for Males; in *Pressman v. D'Alesandro*, 211 Md. 50, 125 A. 2d 35 (1956), the Mayor, the City Comptroller and members of the City Council of Baltimore City; in *Nesbitt v. Fallon*, 203 Md. 534, 102 A. 2d

2. *Clerks of Circuit Courts*, 7 Ops. Att'y. Gen. 460 (1922); *County Commissioners*, 6 Ops. Att'y. Gen. 226 (1921), 13 Ops. Att'y. Gen. 214 (1928), 48 Ops. Att'y. Gen. 323 (1963); *Congressman*, 2 Ops. Att'y. Gen. 352, 355 (1917); *City Councilman*—with salary—2 Ops. Att'y. Gen. 352, 354 (1917), 11 Ops. Att'y. Gen. 100 (1926), 20 Ops. Att'y. Gen. 586 (1935), 48 Ops. Att'y. Gen. 323, 332, 333 (1963); *Mayors*, 6 Ops. Att'y. Gen. 226, 232 (1921), 7 Ops. Att'y. Gen. 476 (1922), 23 Ops. Att'y. Gen. 386 (1938); *judges of the Orphans' Court*, 15 Ops. Att'y. Gen. 237 (1930), 48 Ops. Att'y. Gen. 323, 326 (1933); *delegates to State Conventions to consider repeal of 18th Amendment to U. S. Constitution*, 18 Ops. Att'y. Gen. 408 (1933); *members of the General Assembly*, 3 Ops. Att'y. Gen. 271 (1918), 6 Ops. Att'y. Gen. 231, 232 (1921), 8 Ops. Att'y. Gen. 438 (1923), 12 Ops. Att'y. Gen. 201 (1927).

284 (1954), a member of a county liquor board; in *Buchholtz v. Hill, supra,* the clerk to the Board of County Commissioners of Allegany County; in *Kimble v. Bender,* 173 Md. 608, 196 Atl. 409 (1938), a justice of the peace; in *County Comm'rs. v. Monnett,* 164 Md. 101, 164 Atl. 155 (1933), the Treasurer of Calvert County; in *Day v. Sheriff of Montgomery County,* 162 Md. 221, 159 Atl. 602 (1932), a police justice of Takoma Park; in *Lilly v. Jones,* 158 Md. 260, 148 Atl. 434 (1930), a member of the Port Development Commission of Baltimore City; in *Truitt v. Collins, supra,* a city councilman of Snow Hill; in *Sappington v. Slade,* 91 Md. 640, 48 Atl. 64 (1900), a supervisor of elections; in *Robb v. Carter,* 65 Md. 321, 4 Atl. 282 (1886), the City Solicitor of Baltimore City; in *Harman v. Harwood,* 58 Md. 1 (1882), the Register of Voters for a district in Anne Arundel County; and in *Warfield v. County Comm'rs. of Baltimore County,* 28 Md. 76 (1868), the Commissioner of Records to restore and re-establish records destroyed by fire in the office of the Circuit Court for Baltimore County. In view of this wealth of prior authority, it is difficult to believe that a delegate to a Maryland Constitution would not also be a "public officer" and the holder of an "office."

In *Moser v. Board of County Comm'rs. of Howard County, supra,* we mentioned five criteria which are often present when a position has been held to be a "public office," although the absence of one or more of these criteria would not be fatal to a holding that a particular position is a public office. As pointed out in the majority opinion, these criteria are:

1. The position was created by law and cast upon the incumbent duties which are continuing in nature and not occasional.

2. The incumbent performs an important duty.

3. The position calls for the exercise of some portion of the sovereign power of the State.

4. The position is for a definite term for which a Commission is issued, a bond required and an oath required.

5. The position is one of dignity and importance.

In my opinion, *all five criteria are present* for the position of delegate to the Constitutional Convention.

## 1.

The majority indicates that the position is not "under principles we see as controlling, one created by law as the term law is used in the definition." No authority is cited for this position and I cannot think it is sound. If the position of delegate to this Constitutional Convention was not "created by law," how was it created? It did not like Minerva spring full grown from the head of Jove. On the contrary, it was created by Chapter 500 of the Acts of 1966 and Chapter 4 of the Acts of 1967. Chapter 500 in its title recites that it was an act to provide for the calling of a Convention under certain circumstances "and to *provide* for the number and appointment of delegates thereto." This Act provides that if the Convention is called, each county and each legislative district in Baltimore City shall have in the Convention "the same number of delegates" as Chapter 2 of the Acts of 1965 (Special Session) provides shall be elected at the General Election in 1965. Chapter 4 of the Acts of 1967 makes provision with respect to the election of those delegates provided for in Chapter 500. Both Chapter 500 and Chapter 4 are Acts of the General Assembly, passed pursuant to the present Constitution, presented to the Governor for his consideration and signed by him. I cannot think that this position of delegate is not "created by law."

I also believe that the position of delegate to the Convention has "duties which are continuing in nature and not occasional." The elected delegate holds his position for the entire time during which the Convention is in session—a three and possibly a four month period. It continues for this entire period; it is not sporadic or casual. The duties are not "occasional" so far as the Convention is concerned. Indeed, Chapter 5 of the Acts of 1967, providing compensation and expense money for the delegates indicates that constant attendance is expected as there is a deduction of $15.00 from a delegate's compensation for each day of unexcused absence from the sessions of the Convention.

The position fortunately is not created frequently as, generally speaking, amendments to constitutions are sufficient to meet new or changed conditions, rather than the calling of a Constitutional Convention to frame a new constitution, but this does not mean that when a Constitutional Convention is called, the *duties* of a

delegate are occasional or not continuing. I do not see the relevance of the century plant and the sexual functions of the male honey bee mentioned in the majority opinion—as interesting as both are.

### 2.

It is conceded in the majority opinion that a delegate does "perform an important duty."

### 3.

The majority apparently adopts the contention of the Attorney General in this case (which was also adopted by the trial court) that although a delegate to the Constitutional Convention does exercise sovereignty, it is the "sovereignty *of the people*" he exercises rather than the "sovereignty *of the State.*" The supposed distinction between "sovereignty of the people" and "sovereignty of the State" eludes me. With respect, I fear the "distinction is one without a difference." In Maryland, there is no sovereignty but that of the people. *All sovereignty* emanates from the people. No official or other person may exercise sovereignty which is not sovereignty of the people, be it the exercise by the Governor, judges, members of the General Assembly, notary public or by any one else. There is no distinction, in my opinion, between sovereignty of the State and sovereignty of the people. No authority is cited in support of this unusual concept in the majority opinion and I think the concept is erroneous. The sovereignty required by this criterion is exercised by the delegates to a marked degree.

It should be pointed out that the phrase "sovereignty of the State" has only been recently used by the Court in cases involving executive officials. See *Moser v. Board of County Comm'rs. of Howard County, supra* (notary Public); *Howard County Metropolitan Comm'n. v. Westphal, supra* (member of Howard County Metropolitan Commission); *Hetrich v. County Comm'rs. of Anne Arundel County, supra* (county business manager); *Gary v. Board of Trustees of the Employees' Retirement Sys. of Md.*, 223 Md. 446, 165 A. 2d 475 (1960) (deputy State Auditor). An earlier case used the word "sovereignty" in its broad sense as the sovereign power of the people as well as that of the State, when considering elective officials. See *Truitt v. Collins, supra* (town councilmen). In *Truitt,* Judge Urner, for the

Court, adopted the test as enunciated by the Supreme Judicial Court of Massachusetts in *Attorney-General v. Tillinghast*, 203 Mass. 539, 89 N. E. 1058 (1909), as follows:

> "It may be stated as a general rule, fairly deducible from the cases discussing the question, that a position is a public office when it is created by law, with duties cast upon the incumbent which involve the exercise of some portion of the sovereign power and in the performance of which the public is concerned, and which also are continuing in their nature, and not occasional or intermittent." (122 Md. at 531, 89 Atl. at 851-52).

If it could be assumed, *arguendo*, that there was a distinction between "sovereignty of the people" and "sovereignty of the State," the latter being possibly that portion of the sovereignty of the people which an officer holds in order to perform a function of government for the people, nevertheless, a delegate to the Constitutional Convention exercises such sovereignty.

The Constitutional Convention in preparing a proposed Constitution exercises legislative power of the highest order. The delegates formulate the State's highest organic law and the draft of the proposed Constitution may only be adopted *in toto* by the electorate. Both the formulation—the legislative act—and the adoption by the people must occur before a new Constitution can be effective. Both are necessary to establish the State's highest organic law. But the Constitutional Convention exercises "State sovereignty" in connection with its primary function, i.e., (1) it must employ adequate personnel to enable it to function, and (2) it must authorize the expenditure of the revenues of the State to carry on its functions and pay personnel employed by it. This means that the Constitutional Convention necessarily must contract in the name of the State for the services and supplies necessary to carry out its functions. Indeed, the State administration has already budgeted $1,000,000 for the initial operation of the Constitutional Convention. There will most likely be expenditures in excess of the budgeted amount which the State Treasury must pay. This is most certainly the exercise by the Convention of "State sovereignty." Moreover, the Con-

stitutional Convention is to adopt a *schedule of legislation* to be attached to the proposed draft of the new Constitution which if the proposed Constitution is adopted, will not be a part of the Constitution "but shall have the effect of a public general law and may thereafter be amended or repealed by law." See Section 16 of the proposed Convention Enabling Act, *Report of the Constitutional Convention Commission on Constitutional Convention Enabling Act,* January 16, 1967, page 32. This recommendation, with amendments, was adopted in Chapter 4 of the Acts of 1967. See Section 17 of that Act. Indeed Section 17, as amended, directs the Convention to provide for the inclusion of "implementing legislation * * * (as necessary or desirous) in the Statute books of this State, including the Annotated Code of Maryland." It is difficult to believe that this power to adopt statutes and codify them, is not the exercise of the "sovereignty of the State." It is clear to me that it is.

4.

The position most certainly has a definite term and it was contemplated by the proposed legislation in 1967 and enacted into law by Chapter 4 of the Acts of 1967, that a delegate take an oath. No bond is required as the delegate does not handle collections for the public. For a similar reason, bond is not required for members of the General Assembly.

5.

It is conceded in the majority opinion that the position is one of dignity and importance—as it obviously is.

A Constitutional Convention may be viewed as a part of the whole system referred to as "government." It is the highest branch of that system which works out the will of the people in relation to delegated and restricted political power. Jameson in his treatise *Constitutional Conventions* (4th Ed. 1887) §324 refers to a Constitutional Convention as "a part of the apparatus by which a sovereign society does its work as a political organism." He further states:

"It [the constitutional convention] is the sovereign, as organized for the purpose of renewing or repairing the governmental machinery. That same sovereign, as

organized for the purpose of making laws, *is a legislature;* as organized for the purpose of applying or carrying into effect the laws, it is the judiciary or the executive. These successive forms into which the sovereign resolves itself, are but systems of organization having relation more or less directly to the government of the society. *Together, they constitute the government* \* \* \*. The government of the Commonwealth is a totality of those instruments through whose ministry its political organization is begun and continued. It is that totality which governs, \* \* \*." (Emphasis supplied).

In addition, it is apparent that the Constitutional Convention Commission understood that the delegates were officers. In the proposed Enabling Act appearing in the Report of the Commission dated January 16, 1967, the position is referred to as an "office." See for example, Section 7 of the proposed Act (Report, p. 26), which provides, in part, as follows:

"If a vacancy occurs in the *office of delegate* to the Convention prior to the first meeting of the Convention, the *vacancy* shall be filled *by the Governor*, \* \* \*." (Emphasis supplied.)

See also p. 36 of the Report.

It was recommended that delegates be required to take the oath or affirmation prescribed by Section 6 of Article I of the present Maryland Constitution (see Report, p. 26, Section 8 of the proposed Act.) Section 7 of Chapter 4 of the Acts of 1967 provides:

"If a vacancy exists in the *office of delegate* prior to the first meeting of the Convention in plenary session on September 12, 1967, the vacancy shall be filled by the Governor \* \* \*." (Emphasis supplied).

Section 8 of Chapter 4 provides for the taking of an oath or affirmation in the form set out in Section 8. Chapter 5 of the Acts of 1967 provides for the compensation of the delegates. In short, both the Commission and the General Assembly refer to

the *"office of a delegate"* and treat it as an office, providing for an oath and for compensation from the State Treasury. They thought a delegate held an office under the Constitution or laws of the State of Maryland, and so do I.

The trial court and the majority of this Court were impressed with the practice in the 1851, 1864 and 1867 Conventions in permitting members of the General Assembly to be delegates to those Constitutional Conventions notwithstanding constitutional limitations on the holding of any other office of profit, and concluded from this practice that delegates to those Constitutional Conventions were not considered to be "offices of profit" under the prior Constitution or laws. I do not think this conclusion follows. The validity of the holding of the position of delegate by members of the General Assembly in the prior Conventions was never challenged judicially *prior to the time the Convention met*, as is the situation in the present case. Assuming that the members of the General Assembly were improperly elected and qualified as delegates, they were nevertheless *de facto* officers of the Convention. Cf. *Kimble v. Bender, supra*. After the adoption by the people of the proposed constitution, no one could challenge the action of the Convention because of the illegal presence as delegates of the relatively few members of the General Assembly.

After the Constitutional Convention convenes, *it* is the judge of the qualification of its members and when it decides (as the 1864 Constitutional Convention did decide) that its members are validly qualified, there can be no successful challenge to that action, regardless of what might have been decided prior to the convening of the Convention. See also *Anderson v. Baker, supra*. The present case is the *first one* in which a judicial determination has been sought *prior* to the convening of the Constitutional Convention, so that it is an entirely new issue unaffected by prior examples of possible illegality or disregard of constitutional provisions.

Then too, in my opinion, the words of the Constitution are not ambiguous, so that no prior "construction" of those words by prior conventions may be considered to cause us to depart from this plain meaning. See *Moser v. Board of County Comm'rs. of Howard County, supra*, holding that a notary pub-

lic was an officer within the meaning of Article 35 of the Declaration of Rights notwithstanding the long established practice to the contrary. Indeed, our decision in *Moser* precipitated a constitutional amendment to exclude notaries public from the definition of "office of profit."

As I read the cases from jurisdictions other than Maryland, it appears that the weight of authority supports a holding that delegates to a Constitutional Convention are officers and that the existing constitutional prohibitions against dual office-holding apply.

In *Fyfe v. Mosher*, 149 Mich. 349, 112 N. W. 725 (1907) the Constitution of Michigan provided that: "No person elected a member of the Legislature shall receive any civil appointment within this state, * * *." A senator of the Michigan Legislature attempted to file for election to the Constitutional Convention of that state. The county clerk refused to place his name on the ballot on the ground that he was not elegible under the prohibition against dual office-holding. The Supreme Court of Michigan held that the position of delegate to the Constitutional Convention was a state office and that the senator was not eligible to serve as a delegate. The Supreme Court of Michigan stated:

> "It is conceded that delegates to the constitutional convention are state officers. * * * We are all of the opinion that delegates to the constitutional convention come within the term 'civil appointment' as used in this provision of the Constitution, that they receive their appointment from state authority, and therefore that members of the Legislature which enacted the law and thus provided for the offices, fixing compensation, etc., are ineligible as delegates. They are both within the spirit and letter of the law. The writ is denied."

In *State v. Gessner*, 129 Ohio St. 290, 195 N. E. 63 (1935), the Supreme Court of Ohio held that a member of a County Charter Commission convened to draft a new constitution for a county (analogous to a state constitutional convention) was the holder of a "public office of trust" within the meaning of the Ohio Constitution and hence a judge elected to serve on the Commission was precluded by the provisions of the Ohio Con-

stitution from serving as such a commissioner. The Supreme Court of Ohio said in its opinion:

> "While there is disagreement, the weight of authority and the more logical reasoning support the proposition that a state constitutional convention, in the discharge of its powers, duties and obligations, performs an important act of sovereignty and exercises legislative functions of a high order." (129 Ohio St. at 293, 195 N. E. at 64).

In *Kederick v. Heintzleman*, 132 F. Supp. 582 (1955, D. Alaska), the Organic Act of Alaska (37 Stat. 512) provided:

> "That no member of the legislature shall hold or be appointed to any office which has been created, or the salary or emoluments of which have been increased, while he was a member, during the term for which he was elected and for one year after the expiration of such term; * * *."

The question arose as to whether members of the Alaska Legislature were entitled to serve as delegates to the territorial Constitutional Convention provided for by the Act of the Legislature. In holding that they were ineligible, the District Court stated:

> "The purpose of the prohibition is to eliminate, as far as possible any hope in the mind of the legislator, that the office so created may be filled by himself, and to insure to the people independent judgment of their representatives. It is necessary to good government that the legislators exercise their judgment free from selfish motives and, to this end, these prohibitions have been placed in constitutions and on statute books. If the territorial legislature can create an office and rely on the possibility of Congress lifting the prohibition between the time of the election and the time to hold the office, then it cannot be said that the possibility of bias has been limited to the greatest possible extent." (132 F. Supp. at 585).

Jameson, in his treatise, *Constitutional Conventions,* supra, states in § 324:

> "In my judgment, there can be but little doubt, that a member of a Convention is, in the enlarged and proper acceptation of the term, an 'officer' of the State."

The majority relies principally on *State v. Doyle,* 138 La. 350, 70 So. 322 (1915); *Baker v. Moorhead,* 103 Neb. 811, 174 N. W. 430 (1919); and *Frantz v. Autry,* 18 Okla. 561, 91 Pac. 193 (1907). In my opinion, this reliance is misplaced.

In *Doyle,* convicted cattle thieves appealed their conviction on the ground that the jury lists drawn by the jury commissioner were void because there was a vacancy in the commission. This vacancy was alleged to have been caused by the election to the Louisiana Constitutional Convention of 1913 of one of the jury commissioners who had participated in the drawing of the jury list. It was argued that the office of jury commissioner was vacated by this election to and acceptance of another office. The Supreme Court of Louisiana in sustaining the convictions quoted —apparently with approval from the opinion of the trial court —as follows:

> "* * *[A] member of a constitutional convention is in no proper sense an officer, that such a position is fleeting and casual, and the member does not exercise his functions continuously and as part of the regular and permanent administration of the government." (138 La. at 351, 70 So. at 323).

It has already been pointed out, that the first test in the *Moser* case is satisfied, i.e., that the incumbent had duties which are continuing in nature and which are not occasional. See also Mechem, *Public Offices and Officers,* § 8 (1890); *State, ex rel. Clark v. Stanley,* 66 N. C. 59, 63-64, 8 Am. Rep. 488 (1872). The Louisiana Court has incorrectly analyzed the function of a constitutional convention and its decision, in my opinion, is of little weight in support of the proposition that a member of a constitutional convention is not an officer.

*Baker v. Moorhead, supra,* recognizes that delegates to the

Nebraska Constitutional Convention *are officers.* The point in that case was whether they were officers "who have fixed terms of office, so that they would have to be elected at a *general election* under the provisions of the Nebraska Constitution. In holding that the delegates were not officers *having a fixed term of office,* the Supreme Court of Nebraska stated:

> "Section 13, read in connection with section 14, which has to do with *terms of office,* would indicate that those provisions have only to do with officers elected who have fixed terms of office, and should be elected at an election called with reference to the time of the beginning of their terms. The members of the convention have no fixed term *of office,* and by the Constitution itself the convention may be called at any time within three months after the election of its members." (Emphasis supplied). (103 Neb. at 816, 174 N. W. at 432).

*Frantz v. Autry, supra,* involved an injunction suit to prevent the election of county officials in two new counties created in the proposed Constitution of Oklahoma by the Constitutional Convention at the same election which provided for the adoption or rejection of the proposed new constitution. There was nothing in the suit involving the question of whether the delegates to the Constitutional Convention were officers and, indeed, Oklahoma did not have an existing constitution at the time of filing suit. It was then a territory of the United States, authorized by an Act of Congress to proceed to form a constitution and be admitted as a State of the Union. It was held that the equity court erroneously enjoined the election as such questions were not of judicial cognizance. This case is not in point on the issue of whether delegates to the Convention were "officers."

I consider that the delegates to the Constitutional Convention are the holders of an office created under the laws of the Constitution or laws of Maryland and that the prohibitions of the Maryland Constitution against dual office-holding are applicable.

As I have already indicated, the conclusion that the delegates are officers, although of importance as a practical political matter in possibly inducing the General Assembly to vote for the en-

abling legislation, does not prevent, in itself, the holding of a Constitutional Convention.

Although the Maryland Constitution provides in Article XVI, Section 2 "that no measure creating or abolishing any office, or changing the salary, term or duty of any officer * * * shall be enacted as an emergency law," and Chapter 500 of the Acts of 1966 was passed as an emergency law, we have said that such an attempt to pass an emergency law does not render the statute invalid, but merely makes it effective on the following June 1, as provided in Article XVI. As we stated, by way of *dictum* in *Allied American Co. v. Commissioner of Motor Vehicles*, 219 Md. 607, 626, 150 A. 2d 421 (1959) :

> "If the Legislature provides that an Act, which under Art. 16 may not take effect until June 1, is to take effect sooner, the Act stands but will not take effect until June 1. *Woelfel v. State*, 177 Md. 494, 504-05, 9 A. 2d 826; 1 Op. Att'y. Gen. 286, 288."

In my opinion, this is a correct view of the applicable law so that Chapter 500 would not be invalid and void because it was passed as an emergency measure and purported to be effective upon the date of its passage on May 6, 1966, rather than June 1, 1966.

Even assuming, *arguendo*, that the General Assembly could validly take the sense of the people in regard to calling a Constitutional Convention prior to the General Election of 1970, that Chapters 500 and 501 of the Acts of 1966 are valid and that there was a proper affirmative vote at a valid special election to approve the calling of such a Convention, it seems clear to me that it was not mandatory upon the General Assembly at the time we filed the *per curiam* order of a majority of the Court on March 7, 1967, to call the Constitutional Convention on September 12, 1967. This issue is implicit in Question (i), above discussed. The question propounded to the electorate was not whether the General Assembly should call a Constitutional Convention on September 12, 1967, but was "whether there will be called a Convention not earlier than 1 September, 1967, and not later than 1 September, 1968." This was the only question submitted to the electorate on the calling of the Constitutional

Convention and it seems clear to me that the General Assembly could have repealed Chapter 500 of the Acts of 1966 and changed the date for the meeing of the Convention at any time between September 1, 1967 and September 1, 1968. This most certainly is within the exact language of the question submitted to the electorate. Neither the lower court nor the majority of the Court gives any reason and cites no authority which would remove the right of the General Assembly to call the Convention at any time between September 1, 1967 and September 1, 1968. I conclude that there is no valid reason and that there is no authority holding that the General Assembly might not have done this. I would have so answered Question (i).

I do not think under the circumstances that it is necessary or desirable to consider other questions propounded to us. My answers to the other questions are, I think, obvious and it would unnecessarily prolong this dissenting opinion to develop them in detail.